**No. 22-1067**

---

# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

THOMAS MOORER,

     Plaintiff – Appellant,

v.

CITY OF CHICAGO, et al.,

     Defendants – Appellees.

---

Appeal from The United States District Court
For the Northern District of Illinois, Eastern Division
Case No. 1:18-cv-03796
The Honorable Manish S. Shah,
District Court Judge Presiding

---

## APPELLANT'S

## BRIEF

---

Edward M. Fox
Attorney for Plaintiff – Appellant
Attorney for Thomas Moorer
Ed Fox & Associates, Ltd.
300 W. Adams Street, Suite 330
Chicago, Illinois 60606
Phone: (312) 345-8877
Fax: (312) 853-3489
efox@efoxlaw.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-1067

Short Caption: Thomas Moorer v. City of Chicago, et al

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Thomas Moorer

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

N/A

(3)   If the party, amicus or intervenor is a corporation:

i)     Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)   Provide information required by FRAP 26.1(b)   Organizational Victims in Criminal Cases:

N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: *Edward M. Fox*                    Date: 06/01/2022

Attorney's Printed Name:  Edward M. Fox

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑   **No** ☐

Address:  300 West Adams Street, Suite 330, Chicago, IL 60606

Phone Number: (312) 345-8877                    Fax Number:  (312) 853-3489

E Mail Address: efox@efox-law.com

rev. 12/19 AK

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

JURISDICTIONAL STATEMENT ....................................................................1

I.  STATEMENT OF THE ISSUES ..................................................................1

II. STATEMENT OF THE CASE ......................................................................2

    A.  THE INCIDENT.......................................................................................2

    B.  THE CHRONOLOGICAL WITNESSES' INITIAL DESCRIPTIONS OF THE
       OFFENDER...............................................................................................3

    C.  UPON MOORER'S ARREST THE DEFENDANTS OBTAINED FURTHER
       INFORMATION INDICATING THAT HE DID NOT COMMIT THE MURDER ...10

    D.  THE ALIBI WITNESSES.......................................................................11

    E.  FORENSIC EVIDENCE FURTHER EXCULPATED MOORER .............12

    F.  DECEPTIVE AND IMPROPER POLICE PRACTICES CONTRIBUTED TO
       WRONGFULLY DETAINING MOORER FOR 7 YEARS ........................13

        1.  THE MISSING CELLPHONE ......................................................13

        2.  DEFENDANTS HAVE CONCEALED AND FABRICATED HOW
           PLAINTIFF'S MUGSHOT WAS PLACED IN THE PHOTO ARRAY ...........15

        3.  THE DIGITAL INFORMATION ALSO INDICATES THAT THE REASON
           PLAINTIFF BECAME A SUSPECT WAS CONCEALED ..............................18

        4.  THE DEFENDANTS MANIPULATED AND FALSIFIED POLICE REPORTS
           REGARDING THE FIRST IDENTIFIED SUSPECT- ZEBO...........................20

    G.  EXPERT WITNESS TESTIMONY AND THE UNRELIABILITY OF THE
       LINEUPS..................................................................................................22

        1.  THE LINEUPS WERE SUGGESTIVE................................................22

        2.  IMPROPER POLICE PROCEDURES ALSO CONTRIBUTED TO
           THE SUGGESTIVE AND UNRELIABILITY OF THE LINEUPS..................24

        3.  DEFENDANTS' EXPERT'S OPINIONS ALSO SUPPORT THE
           UNRELIABILITY OF THE LINEUP ...............................................26

4.  THERE WERE MANY IMPROPER POLICE PROCEDURES........................28

H.  MCDERMOTT'S AND FOLINO'S BACKGROUND REVEALS A BIAS AND A
PATTERN OF MISCONDUCT..................................................................................29

III. SUMMARY OF THE ARGUMENT ..................................................................30

IV. ARGUMENT.........................................................................................................31

A.  STANDARD OF REVIEW ...........................................................................31

B.  THERE WAS NO PROBABLE CAUSE TO ARREST THE PLAINTIFF.....................31

C.  THERE WERE MULTIPLE ERRORS BY THE DISTRICT COURT THAT
WRONGLY IMPACTED THE "TOTALITY OF THE CIRCUMSTANCES" IN
ANALYZING PROBABLE CAUSE ...................................................................34

1.  THE COURT'S LEGAL FRAMEWORK FOR ANALYZING THE EVIDENCE
WAS INCORRECT .................................................................................34

2.  THE COURT WRONGLY DEEMED THE IDENTIFICATIONS OF THE
PLAINTIFF AS "ADMITTED" DESPITE MANY FACTS CHALLENGING THEIR
CREDIBILITY AND RELIABILITY ..........................................................36

3.  THERE IS A TRIABLE ISSUE AS TO WHETHER THE POLICE SHOULD HAVE
DISCOUNTED THE WITNESSES' IDENTIFICATIONS........................................38

4.  THE COURT'S ANALYSIS INTO WHETHER THE IDENTIFICATIONS "WERE
COERCED OR MANIPULATED" WAS LEGALLY AND FACTUALLY
INCORRECT ..........................................................................................41

5.  THE COURT'S CONSIDERATION OF "OTHER PROCEDURAL PROBLEMS,
MISSING EVIDENCE, AND EXCULPATORY EVIDENCE" WAS IN ERROR ..44

6.  THE COURT WRONGLY DETERMINED THAT FACTUALLY SIMILAR
CASES WERE INAPPLICABLE RESULTING IN DISREGARDING CERTAIN
SIGNIFICANT EVIDENCE .....................................................................46

7.  REASONABLE AVENUES OF INVESTIGATION REGARDING ALIBI
WITNESSES AND OTHER MATTERS SHOULD HAVE BEEN PURSUED……48

8.  PROXIMATE CAUSE HAS BEEN ESTABLISHED.............................................50

V. CONCLUSION ............................................................................................52

CERTIFICATE OF SERVICE ........................................................................53

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 32(a) ...............................................54

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d) .......................................... 55

TABLE OF CONTENTS TO RULE 30(a) APPENDIX ..............................................................56

APPENDIX ....................................................................................................A1

## TABLE OF AUTHORITIES

*Armstrong v. Daily,* 786 F.3d 529 (7th Cir. 2015) ........................................................... 51

*Brisco v. Ercole*, 565 F.3d 80 (2d Cir. 2009) .................................................................... 40

*Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733 (7th Cir. 2003) ......................... 49

*BeVier v. Hucal,* 806 F.2d 123 (7th Cir.1986) ................................................................. 49

*Chelios v. Heavener,* 520 F.3d 678 (7th Cir. 2008) ...................................................... 33

*Dumas v. Infinity Broad Corp.*, 416 F.3d 671 (7th Cir. 2005) ....................................... 31

*Fox v. Hayes,* 600F.3d 819 (7th Cir. 2010) ..................................................................... 49

*Gray v. City of Chicago*, 18 C 2624, 2022 WL 910601 (N.D. Ill. Mar. 29, 2022) ................. 32,36

*Hart v. Mannina,* 798 F.3d 578 (7th Cir. 2015) ................................................. 35.39, 40, 44, 45,47

*Holmes v. Village of Hoffman Estates*, 511 F.3d 673 (7th Cir. 2007) ........................... 32

*Hurt v. Wise*, 880 F.3d 831 (7th Cir. 2018) ..................................................................... 32,41

*Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) .............................. 32,40

*J.K.J. v. Polk Cnty.,* 960 F.3d 367 (7th Cir. 2020) .......................................................... 50

*Jimenez v. City of Chicago,* 732 F.3d 710 (7th Cir. 2013). ...................................... 47,48

*Jones v. City of Chicago,* 2020 WL 6126161 (N.D. Ill. 2020) ....................................... 39

*Kuri v. Folino* 409 F.Supp.3d 626 (N.D. Ill.), *affm'd Kuri v. Folino,* 990 F.3d 573 (7[th]Cir. 2021)

................................................................................................................ 33,46,48,50,51,52

*Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019) .................................................. 32

*Manning v. Buchan,* 357 F.Supp.2d 1036 (N.D.Ill.2004) ............................................... 48

*McBride v. Grice*, 576 F.3d 703 (7th Cir. 2009) ........................................................... 32

*Michell v. City of Elgin*, 912 F.3d 1012 (7th Cir. 2019) ................................................. 33, 46

*Moorer v. Platt*, 2020 WL 814924 (N.D. Ill. Feb. 19, 2020) ....................................... 41

*Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) ................................. 32,42,47

*Phillips v. Allen,* 668 F.3d 912, (7th Cir. 2012) ........................................................ 35,36

*Sanders v. City of Chicago Heights*, 2016 WL 2866097 (N.D. Ill. 2016) ........................ 22,46,47

*Sexton v. Beaudreaux*, 138 S. Ct. 2555, 201 L. Ed. 2d 986 (2018) ............................... 39

*Smith v. Arteaga*, 2010 WL 3894099, (N.D. Ill. Sept. 30, 2010) ................................... 32

*Spurling v. C & M Fine Pack, Inc.,* 739 F.3d 1055 (7th Cir.2014) ............................... 31

*Washington v. Haupert*, 481 F.3d 543 (7th Cir. 2007) ............................................... 31

*Whitlock v. Brown*, 596 F.3d 406 (7th Cir. 2010) ..................................................... 31

*Woods v. City of Chicago*, 234 F.3d 979 (7th Cir. 2000) ............................................ 32

*Young v. City of Chicago*, 987 F.3d 641 (7th Cir. 2021) ............................................ 32,33,49

## JURISDICTIONAL STATEMENT

Jurisdiction in the District Court is based upon Federal Question, 42 U.S.C. Section 1983.

Jurisdiction in the Appellate Court is based upon 28 U.S.C. §1291, in that this comes to the Appellate Court from a final decision as to all claims and all parties of the District Court.

The date of entry of the judgment in this matter is December 20, 2021.

The filing date of the Notice of Appeal is January 17, 2022.

## I. STATEMENT OF ISSUES

1. Whether the District Court erred by not applying the correct "reliability" standard to the probable cause issue?

2. Whether the District Court erred by deeming facts admitted because the denials challenged the reliability and credibility of an assertion, but not the fact that the assertion occurred.

3. Whether the District Court erred by not considering Plaintiff's experts where it was acknowledged that they provided more than a "bottom line," and the experts qualifications were not challenged or rebutted, because underlying facts were allegedly undisputed but where there were competing inferences and opinions regarding those facts.

4. Whether, in light of not considering expert testimony, and deeming facts "admitted" the Court erred in deciding which among reasonable inferences it would choose.

## II.  STATEMENT OF THE CASE

This is a section 1983 case for a wrongful detention.  On August 28, 2010, Plaintiff was arrested for a murder.  He was arrested after some as yet unknown police procedure (there is no report, and nobody remembers) resulted in he being placed in a photo array.  Seven witnesses identified him, but there were substantial reliability issues and procedure problems with the photo arrays.  Upon his arrest, other facts were learned that pointed away from him (he did not have the nickname of the suspect, did not have the phone number of the suspect, he had no injuries on him despite there being a huge physical fight 15 hours before, and he had alibi witnesses).  A little more than a year later, DNA exculpated him.  Despite that, he was held for 7 years until he was acquitted by a criminal jury.

### A.  THE INCIDENT

On August 28, 2010 an attempted robbery and murder occurred at the residence of brothers Edward and Edwin Ramos and 3 cousins, Miguel and Walter Velez, and Eliezer Martinez.  At that time, just after midnight, they were getting ready to go to a club with 3 female friends who arrived outside just before the murder occurred. They were Delia Rivera, Alina Kindelan, and Jacklyn Hernandez.  Walter Velez was also outside with them.

It was dark outside (near midnight and lit somewhat by streetlights) and the gangway was "pitch black." AF, 19[1]. Three or four African American men arrived. While outside, one of the men near the gangway leading to the basement apartment held a gun which Delia indicated that

---

[1] "AF" followed by a number refers to Plaintiff's Statement of Additional Facts and the number is the paragraph number.  "RSOF" followed by a number refers to Plaintiff's Response to Defendants' Statement of Facts.  AF is Dkt no. 172.  RSOF is Dkt. no. 164.

she saw. RSOF, 13. The man was wearing a mask and some witnesses who were outside said that it came down and others indicated that it did not.  The man told the girls to "get the fuck out of here." *Id.*, 15.  They entered their vehicle and left.   The man held the gun to Walter's head, walked with him through the gangway to the apartment and had him knock on the door.  He did so, and then Eliezer turned the light off in the gangway and Edward opened the door.  The masked man pushed his way in and began shooting.  A violent struggle ensued between the man, Edward, Edwin and Eliezer.  *Id.*, 21-27.  The fight continued, the man was disarmed and then tried to run out of the apartment.  Edward and Edwin went with him outside the door and the man told an accomplice to shoot them.  He shot and then the man and at least 2 accomplices fled. *Id.*, 28-31.

Edward had been shot in the chest and Eliezer was shot in the leg.  They all rushed to the hospital where Edward died. *Id.*, 32-33.

The police came quickly. The girls returned and along with Miguel and Walter were told to go to the police station. *Id.*, 37-39. An investigation occurred and the crime scene processed, and among the things recovered outside was .45 caliber gun and shell casing and black t-shirt laying near a pool of blood.  From the gangway, three spent .40 caliber casings and brown baseball hat and a black piece of cloth were recovered.  Near the gangway a cell phone was found. *Id.*, 41-43.

## B.  THE CHRONOLOGICAL WITNESSES' INITIAL DESCRIPTIONS OF THE OFFENDER

The witnesses went back to the police station (except Eliezer Martinez, who gave a statement from the hospital at 1:10 a.m.) and at 1:30 a.m. began giving statements to various detectives.  The initial witness statements (with the exception of Alina) are memorialized in

General Progress Reports ("GPR"), and subsequently incorporated with some changes into the "Scene" Report.[2] Immediately after their statements they viewed (except, Edwin, Walter and Eliezer, as explained below) a 6 pack photo array and 5 of the witnesses purportedly identified the Plaintiff as the offender who shot Edward. *Id.*, 62-68.

Shortly after that, in the early morning hours, the witnesses each gave video-taped statements to a detective and the ASA. *Id.*, 73. At about 3:25 pm the next day, based upon the witness identifications and statements, Moorer was arrested. *Id.*, 80. Then after 7:00 pm that day the witnesses began doing live lineups at which time they purportedly identified Plaintiff. *Id.*, 92-97. The facts show that there was an evolution and inconsistencies in all of the statements. The common theme in the statements is that the offender that they were describing was the "big" or fat or huge guy. Another common characteristic of the description is that there was not a single specific facial, hair, or otherwise descriptive (e.g., earrings, or glasses or a tattoo, chunky face), feature described about the offender, other than he was huge or fat, and black and in his twenties or thirties. See AF, 12-23.

　　1.　　The initial description of the offender identified as "Zebo" was called in at 12:40 a.m. The first suspect was identified via a radio call from an officer who was as the hospital where Edwin and Eliezer were located. This suspect was nicknamed "Zebo," and was described as a male black, 29-30s, gray shirt, blue jeans 6'2" and 260 pounds, short hair with waves, fled southbound, and last seen before the incident standing near a white Pontiac Grand Prix, 2004-2005 model. AF, 2. A white grand prix had been seen fleeing the scene. The reference to "Zebo" was also given by Edwin to Detective Valkner (as an offender as contained in Edwin's statement,

---

[2] The Scene Report documents, chronologically, the entire initial part of the investigation including interviews and the photo arrays. Ex 5. An "Arrest and Prosecution" Report Ex. 3, picks up where the scene report leaves off and documents the live lineups and subsequent interviews, including alibi statements.

(See Ex. 4, Ex. 5), and was repeated in two police reports that were modified and manipulated (see below), but never otherwise documented.[3]

    2.    Eliezer Martinez's statement and description of the offender was completely different than all the other witnesses. AF, 3-5. He reported seeing only one person.  According to the statement, he described the initial shooter as being a dark-skinned male black, 24-26 years old, 5' 10" to 5'11" and 180-190 pounds. AF, 3.  He also said that he was wearing a red/brown baseball cap, possible grey shirt, and a partially covered lower half of his face. AF, 4. (This was very inconsistent with the other witness' descriptions.)

The Defendants distrusted the description given by Eliezer.  It was the only description not documented in both the Scene Report and Arrest and Prosecution Reports that incorporated these statements. AF, 5.  In fact, Eliezer's statement was the only interview of all the witnesses by ASA Augustus that was *not* video recorded.  *See Id.*  Also, the prosecution did not ask about Eliezer's description at the criminal trial. AF, 96**.** Even defense counsel in their underlying brief herein have not used Eliezer's identification to try to support probable cause to arrest Moorer. With regard to the live lineup, in describing the reason that he chose Moorer, Eliezer testified at deposition that it was because of a fresh scar that was on Moorer's arm. However, the photos show that Moorer did not have a fresh scar on his arm.  RSOF, 106.

    3.    Edwin Ramos (brother of the decedent, Edward) gave the next statement, beginning at 1: 30 a.m., to Defendant Valkner.  He described the incident and the first shooter as a male back in his 30s, 6'-6'3", about 250 pounds, with a dark shirt, blue jeans, tan boots and a mask that came off during the fight.  He also described a second shooter (who he believes also shot his brother),

---

[3] The person who gave this description to the officer was likely Edwin Ramos, because he is one of two witnesses who was at the hospital. He also described a "Zebo" to Detective Valkner, and he was the only witness to have described a suspect as wearing blue jeans.

as a male black in his 20s, 5'11" and 200 pounds, dark complexion, curly afro, a red/green/gray hoody, jeans, and a dark complexion.  AF, 7**.**

Edwin also indicated that he knew the shooter, as "Boom" from two prior encounters with his brother that occurred 4-6 weeks prior to the shooting. Edwin viewed the first encounter briefly from a distance at a night club. In the second encounter, Edwin related that there was a confrontation with "Boom" and that he drove off.  Edwin indicated that Edward sold weed to Boom and that he owed Edward two-three hundred dollars.  Edwin also identified his brother's phone (which was the cell phone located at the scene of the murder), allegedly looked through it with Valkner and saw the name "Boom" with a corresponding phone number of 773-754-2075. AF, 8, 9. At trial, similarly to all witnesses, Edwin made repeated references to the "big guy," or a "bigger guy" and/or a "lot bigger than me." AF, 10.

Edwin was purportedly the first to identify Plaintiff in the photo array, because he said he knew the suspect as Boom.  As discussed, later, this purportedly somehow led to identifying Moorer and inserting him into the photo array.  As also shown below, Edwin did not simply view a photo array as was done by the other witnesses.

4.    Jacklyn also gave a statement beginning at 1:30 am, to Defendant Tedeschi.  In the statement she gave little description, only describing a male black with dark clothing holding an object in his hand. AF, 13**.**

In her video-taped statement, taken very shortly after, she described the offender as "big" At trial she also focused on the fact that he was tall, black and big.  She indicated that she picked out the "big black guy" in the photo array.  She also testified that he did not have facial hair, unlike Moorer. AF, 13-15.  She also indicated that the offender had a mask (that covered his lower face up to just below his eyes) on the entire time she viewed him, so actually she could not

see his face. Jacklyn testified in her deposition that the mask did not come down and she *never* saw the part of his face covered by the mask. AF, 95. She also indicated that she told the detectives that she *never saw the portion of his face covered by the mask.* (Def. Ex. 26, Jacklyn Dep, 31:5-17).

5.      Walter gave the next statement at 2:00 a.m., also to Defendant Valkner. The description reported of the initial shooter was a male black 35-36 years old, a medium dark complexion, black shirt, dark jeans. A second offender with a gun was described as a male black in his 20s, with a white t-shirt. AF, 16. The scene report descriptions were similar.

During the video statement taken at about 10:15 a.m. that same day, Walter described the main offender as wearing a "big black shirt, something over this face…" He also indicated that the offender was wearing a mask covering his face. It was not reported that the mask ever came down. AF, 17. He also indicated that he heard but did not see the shooting. AF 16. For unknown reasons (except that his live lineup identification was equivocal) it is not reported that he took part in a photo array.

Following viewing the live lineup, Walter's lineup report indicates that he was 80% sure that Thomas Moorer was the "individual who shot a handgun which caused the death of Edward Ramos and wounded Eliezer Martinez in the leg." Ex. 36b. Walter, however, never said that in any interview. In his video statement, he said that outside the residence there were *two people* who put guns to his head. He saw the black shirt offender rush the door and then he *heard two shots and after he ran some distance he heard two more shots.* Ex. 5, at PD018547; Ex. 7. In sum, contrary to what is stated in the lineup report, Walter did not see who shot the handgun which caused the death of Edward.

6.      Delia gave the next statement, also at 2:00 am to Defendant Fanning.  In her initial statement, according to the GPR, she described the main shooter as a male black, "25, fat, 5-10, dark, dark skinned, *short dread locks*, white t shirt, dark pants." A second person she described as a male black, teens, and wearing all black. The third individual was described as a male black "teens, 5-9, 150, white t shirt, black pants, b-ball hat." AF, 19**.** The Scene Report did not contain any of the physical description that she described in the GPR report (likely because no other witness described him with dread locks and a white t-shirt).

At an interview before the video-taped interview, she stated that the offender put a mask "over his face when he stepped out of the gangway." Ex. 3. She described the gangway as "pitch black." AF, 19. In her video-taped interview, she stated that she identified Moorer in the photo array as the "male who shot the gun, the first male."   However, this was impossible for her to see since she was not in the apartment and could not see who was doing the shooting.  RSOF, 68. He also did not have "short dreads" as she said in her initial interview.  At trial, she repeatedly described the suspect as "tall, black and big."  She also described him as "fat" and "chunky." AF, 19, 20.

7.      Alina gave the next statement at 2:10 am to Defendants Leal and Spanos. AF, 21. There was no GPR report (Leal testified that he did not take notes of the statement).  The Scene Report statement describes Alina's description as being a male black, 25-35 years old, with a black shirt or black cloth held over his face 6' tall and 250 pounds. It was not reported that she saw a gun. AF, 21**.**

    In her subsequent video statement and at her deposition, she stated that she did not see anyone holding a gun.  After she participated in the live lineup, Defendants Gonzales falsely wrote that Alina positively identified Moorer as the "individual she observed in the gangway

*holding a handgun.*"  RSOF, 68.  This was notwithstanding that she did not see anyone holding a gun.  In her video statement, she said he was dark, "huge" "big and "really tall."  At trial, she also repeatedly referred to him as the "large black man."  AF, 21, 22.

8.     Miguel gave the next statement, also at 2:10 am to Defendant Tedeschi.  In that statement he described the shooter as a male black, 5'11" – 6'0" and approximately 230 pounds. AF, 23. He also indicated that there were 2 other male blacks who were shorter than "Moorer." (No further description given).  The scene report was similar except that it added that the shooter was about 30 years old.   Also, in his initial interview, as documented in the GPR, nothing is said about observing the offender to shoot Edward; he indicated that he *heard* gunshots.  In the Scene Report, again, it just describes him as *hearing* gun shots.  However, in the report of his lineup it states that Miguel identified Moorer "as the individual *who shot a handgun* which caused the death of Edward Ramos and wounded Eliezer in the leg." RSOF 68.  At trial when he was asked if he actually saw the big black guy "fire his gun" he stated "[u]m, maybe."  That quickly became "No.  No" when asked again. *Id.* He also repeatedly refers to the offender as "big."  AF, 23

In sum, the description of offender number 1 (who became "Boom"/Moorer) was of a male black, 25 to early 30s, who was "fat" or "huge" or 'big" with a very heavy weight description of 250 or 230 pounds, who was wearing dark or black clothes.  There was not a single facial or other identifying description (except wrongly, dreadlocks). The descriptions given during all the interviews and trial focused on the offender's body being "big" or "fat" or something similar.

### C. UPON MOORER'S ARREST THE DEFENDANTS OBTAINED FURTHER INFORMATION INDICATING THAT HE DID NOT COMMIT THE MURDER

After the photo arrays were done, the defendants determined that Moorer did the murder. Defendant McDermott put out an investigative alert for Moorer at 7:50 a.m. on August 28. AF, 43. At roughly 9:30 a.m. Defendants Folino, Benigno and Szwedo began "pinging" the cell phone that they believed was associated with Moorer (based upon the information received from Edward's cell phone). AF, 44. They recorded the phone pinging at locations not close to Plaintiff's residence at 9:45 am, 10:30 am, at 11:30 am, and at 2:30 pm. AF, 44.

At 1:00 p.m., the above defendants were informed that the vehicle that was discovered to be Moorer's vehicle was located at 205 N. Leamington in the alley. AF, 45. At 1:30 pm a surveillance was set up at the location, and at 3:25pm Defendants Gonzalez and Cardo observed Moorer exiting his residence and entering another vehicle with a Caucasian friend. AF, 45. They were both arrested, and Moorer was brought to Area 5 and then talked to Detectives. AF, 45. The phone that was thought to be associated with Moorer continued being used. AF, 12.

Upon his arrest, he was transported to Area 5. Then, upon Moorer being interviewed, Defendants Cardo and Gonzalez (who had taken over the investigation) became aware of several things indicating that Moorer likely did not do the crime. First, Moorer's nickname was not "Boom," it was "Boomer." AF, 51. Second, notwithstanding that the offender had been in a life and death physical fight just 15 hours earlier, Moorer was seen to be completely injury free – not a scratch was on him. (Both Cardo and Gonzalez acknowledged they would have would have documented any injury that was observed.)  Edward, Edwin and Eliezer, all had physical injuries on them consistent with a fight. AF, 52.  Third, despite much blood being spilled at the scene of the crime, Moorer was not seen with any blood on him. AF, 52. The Defendants did not record finding anything in Moorer's vehicle that was associated the crime. *Id.*, 32-35. Fourth, Moorer

10

did not have a cell phone on him at the time of his arrest; the cell phone that had been associated

with "Boom" had been pinging at other locations at a time when Moorer was known to be at his

residence, and that phone continued to be used after his arrest. AF, 12, 44- 45. Fifth, as noted

above, Moorer did not look like the physical description of the offender that the witnesses had

given to the Defendants in that he was not "fat, "huge" or 250 pounds (he then weighed

approximately 180). AF, 1; Ex. 43.  Sixth, during Moorer's interview at the police station, he

told the Defendants that he had been at a family party at his residence the entire day and night

before. AF, 53. Moorer further indicated that many people at the party, including his girlfriend,

knew Moorer to have been at his residence at the time of shooting. AF, 53, 55-56. Defendants

confirmed this the next evening when they spoke to 2 of his alibi witnesses. AF, 57-58. Seventh,

the car seen leaving from the scene of crime was different than Moorer's car. AF, 54. In sum, the

Defendants had substantial information that indicated that Moorer did not commit the crime.

### D.  THE ALIBI WITNESSES

With regard to his alibi, Moorer told the detectives that he was in his computer room "all

day," that there was a party the previous night, and that there were 18 kids and people in his

house at the party. He said that you could talk to "her," referring to his girlfriend and "she gonna

tell you where I was…" He also told Defendant Gonzalez to call his girlfriend and let her know

where he is and she would tell them where he had been the night before. AF, 53, 55-56.

Defendants McDermott and Folino went to Moorer's residence. They did not go there

until nearly 10:00 p.m. on August 29. AF, 57. When they arrived, they did not interview Lakisha

Shorter, Moorer's girlfriend, despite her answering the door, and McDermott and Folino

realizing that she was Moorer's "baby Mama." AF, 57, 62. They talked to Vaneglen Moorer and

Jeanetta Noble, Moorer's sisters. They obtained oral statements from them indicating that

11

Moorer had been home the previous day and night. AF, 58. According to the summary of their initial statements, Vaneglen stated that there was a party downstairs but that she would go upstairs to check on her kids from time to time and Jeanetta stated she had seen Moorer in the computer room. She said that the last time she saw Moorer, he was in the computer room watching TV but did not know what time that was. AF, 58.

The ASA approved charges just after midnight. AF, 60. The Defendants apparently felt that they needed to mitigate the problem that the alibi caused the prosecution. Later, in the middle of the night, after 3:00 am, Defendant Szwedo went to Plaintiff's residence to pick up Vaneglen Moore and Jeanetta Nobles, 19 and 23 years old respectively, and brought them to the station to have them sign statements. They did not know the police were coming for them and they were not given a choice about "cooperating". AF, 60-61. They then signed statements – unlike every other witness who had instead gave video-taped statements. These statements modified the initial statements in that Vaneglen stated that she was upstairs most of the time and that she remembers seeing Moorer "some of the times" she went down to the party. AF, 61. Jeanetta's statement now said that she went to sleep at 10:00p.m. (during a party that was being held) and did not wake up until 2:00a.m. where she saw Moorer talking to Lakisha Shorter in their room. AF, 61. Other alibi witnesses, including Lakisha Shorter, knew where Moorer had been but were not interviewed although they lived at the same residence. AF, 62.

### E.    FORENSIC EVIDENCE FURTHER EXCULPATED MOORER

There was an abundant amount of forensic evidence that was left at the scene of the crime. Many items were found to have DNA on it. This included DNA evidence taken from a brown hat, two pieces of black cloth (that were likely used as the mask the offender wore) and a portion of a collar from a shirt. There was a biological unknown dark colored substance and

swabs with blood on it recovered from a wall outside the residence where the crime occurred. Edwin indicated this was "suspect" material.  AF, 63.

All the descriptions of the main offender (Moorer) had him wearing some sort of cloth black mask over his face during the robbery. The mask was described either as piece of black cloth or a bandana. AF, 7, 21. Eliezer and Edwin, identified the offender, later said to be Moorer, as wearing a brown cap. AF, 4,7. Moreover, a report stated that the two pieces of black cloth and baseball cap were recovered where the "defendant (Moorer) and unknown co-offender(s) were before, during and after shooting." AF, 64.

The DNA results to these items came back at least as early as February 12, 2012. AF, 65. From the brown hat, there was a mixture of 2 DNA profiles identified. The DNA profiles did not match the Plaintiff or Edward, Edwin, Walter, Miguel and Eliezer.  In fact, all of these persons were *excluded.*  AF, 65.  Both pieces of black cloth were found to have a mixture of the DNA of at least 3 people. On both pieces of cloth, all of the above people were excluded as having contributed to that DNA. Finally, there was the portion of a collar from a shirt that was found. Again, all persons identified above were excluded. AF, 65. No DNA consistent with Moorer was found.  As a result, Moorer was excluded from being at the scene.

F.  **DECEPTIVE AND IMPROPER POLICE PRACTICES CONTRIBUTED TO WRONGFULLY DETAINING MOORER FOR 7 YEARS**

  **1. THE MISSING CELL PHONE**

Edward's cell phone had been located at the scene by forensic investigators who had arrived at 2:10 a.m.  The investigators gave the phone to Defendant McDermott at the scene at McDermott's request (who was among the initial detectives to arrive at the scene). Defendants McDermott and Becker examined and documented the scene. RSOF, 37.

The next mention of the cell phone was contained in Detective Valkner's GPR of his initial interview of Edwin at 1:30 a.m. During that interview, Edwin purportedly showed that he knew "Boom" and located the nickname Boom and his associated cell phone number in the phone. Valkner's GPR of Edwin's interview recites that he "ID Edwards phone" (sic), and then the name "Boom" with a phone number is noted. AF, 9. The subsequent Scene Report summary expanded on this and notes that "Edwin related that his brother has sold cannabis to Boom in the past and his phone number could be found in Edward's phone. The R/D and Edwin searched the contacts and found "Boom" 773-754-2075." *Id.* Edwin testified that he told the Detectives there may be things in the phone that would "tie it all together." AF, 10. This was the last mention of the phone in any reporting in connection with the investigation.

The phone was obviously important. Boom's phone number was used to try and locate the offender, and it was the subject of an FBI analysis. RSOF, 122-123; AF, 46-47. The FBI found that the phone was not located at Moorer's house during the relevant two days. RSOF, 42. This was the last mention of the phone in any reporting in connection with the investigation.

At his deposition, McDermott testified that he has no recollection of seeing the phone at the scene. He knew that the fact that there was marker number 4 next to the phone at the scene meant that it was a piece of documented evidence. AF, 67. He also claims not to remember being given the phone at the scene, but will not dispute that it happened. McDermott also admitted that he should have documented and inventoried it. AF, 67. He also claims to be unaware of any documentation regarding what happened to the phone. Regarding the phone, McDermott testified that his practice would have been to put it into a manilla envelope in the file when he got back to the station with paperwork, "to hand on to the next group of people…" AF, 67. Similarly, Defendant Valkner who purportedly looked at the phone with Edwin testified that

he does not remember looking at the phone and does not remember what he did with it after his interview with Edwin. AF, 69. He also claims that he does not recall from whom he received the phone. AF, 68. He claims that he does not recall calling the number that was found in the phone although that is something that he would do.[4] But, there is no report that he did it, and if so, what the result of dialing it was. AF, 68. Edwin testified that he does not recall looking at the cell phone during his interview with Valkner and does not know how he could have because he did not know the password. AF, 10.

McDermott agreed that it was an important piece of evidence that helped to narrow the focus of the investigation. AF, 67. The phone had the name Boom which is what, in some murky way, led to Plaintiff being placed in the photo arrays. Also, inexplicably, Valkner purportedly documented going through the phone with Edwin at his interview that lasted from 1:30 a.m. to 2:00 a.m.- while the phone was still at the scene (as the forensic investigators could not have discovered until after 2:10 p.m. – when they arrived).

## 2. DEFENDANTS HAVE CONCEALED AND FABRICATED HOW PLAINTIFF'S MUGSHOT WAS PLACED IN THE PHOTO ARRAY

There is no police reporting, anywhere, of how the Defendants came to identify Plaintiff as a suspect to explain why his mugshot was placed into a photo array. When asked, no Defendant could remember or knew how it happened. RSOF, 55; AF, 28-29. Also, the Detectives did not save a printout of the purported computer nickname search or any document that relates to this. AF, 35-36, 39, 41.

In their underlying brief, to try to compensate for the Defendants' incredible lack of knowledge of how they targeted Moorer, the Defendants made up their own factually

_____

[4] The notion that he does not remember anything about his interviews with either Edwin or Walter is not credible. He remembered quite a bit when it was relevant to his defense. AF, 69.

unsupported version of how it came about that Plaintiff was initially identified in order to be placed into a photo array.  The Defendants' version of this is that a nickname search of "Boom" was done, and that Edwin was shown pictures of 100 individuals who went by the nickname of "Boom" or some variation. Edwin then picked out Moorer from these pictures after 20-30 minutes. Then, Tedeschi supposedly went on the mugshot database at 1:30 a.m., and created a photo array that included Plaintiff. Dkt. 155, at 12, 13.

The Defendants are obtaining these facts from thin air. It is loosely based on Edwin's testimony. This story is inconsistent with the facts; it also could not have been done the way that Edwin testified, and Tedeschi contradicts it. AF, 42.  Edwin's and the Defendant's current version is also not possible because both contradict the evidence. Edwin testified that he looked at 2 "books" of photos that he thought were 3 ring binders, that were filled with pictures, and after 20-30 minutes he purportedly identified a photo of Moorer. RSOF, 56. However, defendants did not maintain books of pictures or mugshots at the police station. AF, 31.  No such notebooks existed. AF, 31.  Finally, the representation that "detectives showed Edwin over 100 individuals who went by the nickname…"  is just made up; Edwin being shown 100 photographs has no basis in the record. Edwin also testified further about what happened after he looked at the books of photos. He testified as follows:

> Well, [the detectives]stepped out of the -- they stepped out and then they came back in and I believe they had asked me -- they came out -- *they came with that same printout of the -- a separate printout of it and asked me, okay, so is that the person that you picked* and I said yeah and they said, okay, well, we need you to sign under here [the photo array] stating that that's the person you picked.

(AF, 32)

Also, Tedeschi testified that it did not happen the way that Defendant now speculates. According to Tedeschi and a 30(b)(6) witness, when an officer creates a photo array, they go into

the computer on the CLEAR database and enter a command to obtain "similar" or "query demographics." See *infra* section II.G.3. The computer identifies for the officer 200 images that fit the demographics he was searching. He then picks out the best photos for the particular photo array. Id., 29-30, 34-35.  Importantly, also contrary to Defendants' version, Tedeschi testified that *he did not create the photo array in this case* because only 5 minutes elapsed between the start of his interview with Jacklyn and when she viewed the photo array. This was not enough time to do it, so Defendants' version is not correct. AF, 42.

Defendants' version is also inconsistent with a version of this Detective Gonzalez gave at a suppression hearing during the criminal proceedings. Gonzalez testified at the suppression hearing that Edwin told Detective Valkner that he recognized the main offender and that his nickname is "Boom". Gonzalez then testified that this nickname was run in the computer to find persons with the nickname of "Boom." AF, 24-25. When this is done, the computer identifies everyone with the nickname of "Boom" or anything similar. AF, 24. The inference from Gonzalez's testimony (because he gave no further details in his testimony) was that the Detectives obtained this list of persons and in some unknown way identified Moorer from the list of names that the computer would have generated. Gonzalez did not testify how running the nickname in a computer actually led to identifying Moorer as a suspect. AF, 25. This information is needed because when the nickname is put in a computer search, the computer will generate, city-wide, all persons who have the nickname, "Boom," "Boomer," "Booman," or anything similar. (The Defendants never saved such printout or otherwise documented doing this.)

This nickname computer search was actually done when Plaintiff's Public Defenders subpoenaed this information in 2016. In response, they received a computer printout with nearly

200 names of people who had corresponding nicknames.[5] AF, 26. How the Defendants settled on Moorer's mugshot out of the nearly 200 similarly nicknamed people is unknown.  Further, Gonzalez's actual knowledge about his testimony was very limited. At deposition in this case, Gonzalez testified that he (1) did not know which detective "discovered" Moorer, (2) how many persons with the nickname were produced via the computer, and (3) he did not know how they arrived at Plaintiff's mugshot from all the names that would have been produced by the computer search for the nickname Boom. AF, 25.  So, he really did not know of what he was testifying during the suppression hearing.

Also, the timing of the events does not support Gonzalez's version. Jacklyn's and Edwin's interviews began at 1:30 am. Just five minutes later, at 1:35 a.m., Jacklyn was shown the photo array with the Plaintiff in it and then identified Plaintiff as the offender. This timing, however, is impossible. According to Edwin's testimony that was referenced by Defendants, he took 20-30 minutes to go through photos before settling on Moorer. RSOF, 56. Additionally, according to Defendant Tedeschi, it would take roughly 20 minutes to put together a photo array once he had a suspect. Id., 42. Thus, it would take 40-50 minutes for this process to occur, but, as noted, the process purportedly took place in 5 minutes; that is, from the beginning of Edwin's interview (at 1:30 a.m.) to Jacklyn looking at a photo array at 1:35 a.m.[6]  Consequently, it is not known how it came to be that Moorer's picture was placed into the photo array.

### 3.    THE DIGITAL INFORMATION ALSO INDICATES THAT THE REASON THAT PLAINTIFF BECAME A SUSPECT WAS CONCEALED

---

[5] Gonzalez confirmed at his deposition that the public defender's 2016 results of searching the database for Boom would have produced similar results in 2010 when it was supposedly done in this case.  AF, 27.
[6] In fact, this timeline does not account for the time that it would take to get the name "Boom" from Edwin and then run the nickname search into the computer and print out photos to be looked at.

As a result of not being able to determine how Plaintiff was made a suspect, Plaintiff requested all the digital information that related to showing how Plaintiff was made a suspect, and this included all computer records relevant to any name, and/or nickname searches of Plaintiff or anything related to Plaintiff. The Defendants produced a declaration from Steve Maris who has been the director of the office of Field Technology for the past 3.5 years and procured many computer records. AF, 33-41. According to Maris' declaration, to create a photo lineup CPD members use the CLEAR database computer system which provides a "query photo line-up" program. This program includes a "query demographics" command that "allows members to input a suspect's mugshot into the system, and the system will pull 200 mugshots of arrestees with similar demographics." AF, 33-35. "A member then will select photographs out of the 200 mugshots pulled by the system to create a photo lineup…" *Id.* Once a member creates a photo array, he can save that array by pushing the save button on the computer. AF, 35. If it is not saved, one cannot tell if the officer actually did a photo array. AF, 35.

In doing his research, Maris found that of 24 detectives that were involved in the Ramos murder investigation (this includes defendants and others), he determined that Tedeschi logged into the "mugshot" system initially at 1:30 a.m. AF, 37.  He was unable to tell what specific command was made at that time. However, he could tell that it was not a "query demographics" command. AF, 34. Maris also found that there were 7 distinct users who created and saved photo lineups. AF, 38. None of them were created by Tedeschi or any other person involved in the Ramos homicide as they were not saved in the system (unlike the 7 users who did save them). AF, 38. Maris also determined that there were 36 distinct computer users who did a "query demographics" command. Tedeschi (the only detective connected to the Ramos investigation) is one of them, *but he did not do this until 2:26 am*. AF, 39. The documents show that Tedeschi

executed such searches 8 times beginning at 2:26 am, well after all but one of the photo lineups had been completed. AF, 34. Tedeschi did not save a single one of these searches, so it is unknown what demographics he queried. AF, 39. Also, Maris established that the CLEAR data base log was searched for those who viewed the nickname "Boomer." AF, 40. This was viewed 10 times; the first time by Defendant McDermott at 4:40 a.m. and 9 times by Detective Taraszewicz beginning at 11:31 p.m. on the 28th (long after all the lineups had been done). AF, 40. That is all there is in connection with any information about creating a photo array with Plaintiff in it.  In sum, nothing in the computer can corroborate a search for anything related to identifying Plaintiff as a suspect. Finally, if an officer did search for persons who had a specific nickname, this could have been printed out even though the computer might not log this information. AF, 41. It was not printed out.

### 4.  THE DEFENDANTS MANIPULATED AND FALSIFIED POLICE REPORTS REGARDING THE FIRST IDENTIFIED SUSPECT – ZEBO

As noted, the first description came from an officer at the hospital shortly after the murders at 12:40am.  It was the most detailed of the suspect descriptions and identified that offender as *"Zebo."* AF, 2.  In what appears to be the initial submitted written report, dated the day of the murder,[7] the descriptions of the offenders and identifications of witnesses were documented in the appropriate section of that report.  There, the suspect with the alias "Zebo" was described (male, black, 29-30, 6'2", 260 pounds, black hair, short hair style, brown eyes, medium brown complexion, Gray T-shirt, and blue jeans).  AF, 50.  What appears to be the next submitted report (September 2) described Zebo identically as in the previous report.  *Id.*  These

---

[7] That was the morgue report submitted on August 28, 2010.  In a subsequent report, filed on September 2, the same description for "Zebo" was used. AF, 49-50.

descriptions obviously differed dramatically from Moorer in both weight and nickname. But, in subsequent reports, the description on the number 1 suspect changed without any explanation.

In the subsequent Scene Report, submitted October 30, the description was dramatically different and very inconsistent with the witnesses' description.  The number 1 suspect was changed from "Zebo" to "Thomas Moorer," with an alias of "Moore," who was 39 years old (10 years older than the Zebo description). The physical description listed him as 6' and 190 pounds. This matched Moorer's description as contained in his rap sheet and a previous arrest which had been in March 2009. AF, 49-50. This weight description was *very different than the witnesses' current description of the suspect as a heavy, fat 250-pound guy*. AF, 49-50.  The remaining description characteristics listed were identical to the initial case reports: black hair, short hair style, brown eyes, medium brown complexion, and as a wearing grey t-shirt and blue jeans. But, these latter characteristics were *not given by any witness* other than the officer who had originally called in the "Zebo" description*.  (All of whom other than Edwin, had the offender wearing dark or black clothing.)  The subsequent main report, the Arrest and Prosecution Report (submitted October 30), changed again.  The first offender was listed as Moorer with an alias of "Boomer," 39 years old, and now increasing the weight and height to be 6'2" and 260 – more consistent with the physical description given by the witnesses.  Nevertheless, even this did not match Moorer's actual description because he then weighed about 180 pounds.  AF, 1; Ex. 43. In sum, the descriptions of the main suspect in the police reports evolved from a fairly specific description of "Zebo" (a name also reported by Edwin) to a description matching Moorer's true description (but unlike the witnesses' description), to a description identifying Moorer as Boom, with a height/weight description consistent with the witnesses' description, but unlike Moorer's then current weight description.

### G. EXPERT WITNESS TESTIMONY AND THE UNRELIABILITY OF THE LINEUPS

#### 1. THE LINEUPS WERE SUGGESTIVE

One of Plaintiff's expert witnesses was Geoffrey Loftus, an Emiritus Professor of Psychology at the University of Washington in Seattle where he had taught since 1972. AF, 70. He has extensively published on issues of witness perception and lineup identification reliability. He has testified on these issues hundreds of times, including Moorer's related criminal case as well as other cases in Cook County and within the Seventh Circuit. See e.g., *Sanders v. City of Chicago, 2016 WL 2866097 (N.D. Ill.)* AF, 70.

Dr. Loftus concluded that the photo array and live lineups in which Plaintiff was a part were not reliable in several material ways. AF, 71. This included (1) that Moorer appears to be the largest person in the array so that he conforms most closely with the witnesses' descriptive theme of the offender which most commonly described him as "fat," "huge" or weighing 250 pounds (as noted, the offender's large size was the theme of the witnesses testimony); (2) also, conversely, none of the fillers looked fat or huge or weighing 250 pounds; (3) that Moorer does not, in fact, resemble the offender in that he was not "fat" (he clearly did not weigh 250 pounds)[8] and he had facial hair; (4) Moorer was the only person common to both the photo array and live lineup which took place within hours of each other, and as a result, there was a likelihood that the witnesses' identification of Moorer in the live lineup was based on their memory of him in the photo array rather than their memory of the offender; (5) All witnesses described Moorer as wearing dark or black clothes, and Moorer was the only person in the live lineup who most closely matched the clothing description of the offender (many of whom had on white t-shirts);

---

[8] The mugshot picture of Moorer used in the photo arrays was taken when Moorer was much heavier, when he weighed about 235-245 pounds. At the time of the murder, Moorer was actually much thinner, at about 180 pounds. AF, 1; Ex. 43.

and (6) the Defendants that administered the lineups knew that Moorer was the subject and thus, there is a likelihood that the witnesses' selections were based upon either conscious or unconscious information provided to the witnesses by the Defendants. AF, 71. These factors all made the lineups suggestive.

Poor viewing conditions also made it difficult for the witnesses to have accurately memorized the offender's appearance. Indeed, there are virtually no facial descriptions. It was night so there was poor lighting where the females and Walter "saw" the offender. AF, 72. The gangway where the females initially "saw" the offender was "pitch black." Because weapons were involved the witnesses were distracted which impacted being attentive to the offenders' appearance. Also, there were multiple offenders that divided the witnesses' attention among them such that their attention was further limited. The witnesses were Hispanic, and cross-racial identifications are less reliable according to many scientific studies. AF, 73. The high stress of the situation also lends itself to less reliable identifications as studies have shown that mental functioning is poorer during a high stress event, which results in few accurate details being memorized and post-event information being supplanted. AF, 74. The "functional duration" of the event (the time that a witness has a close view to discern facial features) was very brief, in large part, because the offenders were wearing masks a large part of the time of the event. Less duration results in reduced reliability. AF, 75. An additional important factor to this case concerns global versus detail processing. Global information is information about large areas of a scene. AF, 76.  Global information is known to be acquired more easily and faster than detailed information.  As a result, features such as a "build" of a person are more easily acquired than a report of a person's facial appearance. AF, 76. Thus, here, the fact that the witnesses'

descriptions were of a person who was "huge" or "fat" or 250 pounds implies that the shooter was likely a huge, fat, 250-pound person, unlike Moorer. AF, 77-78.

There were other factors, according to both Plaintiff's and Defendants' eye-witness identification experts, that show that the lineups were not reliable. Included is that there is a consensus in the expert field that the act of having a witness participate in any lineup in which they pick out a suspect contaminates a witness' memory, such that all subsequent identifications are unreliable. AF, 100. Wixted, Defendants' expert, made this very clear and thus, the live lineup identifications, since they followed a photo array, would be deemed unreliable by both sets of experts. AF 71, 100. Wixted also opined that Edwin's photo array would not be useful or reliable because, according to Edwin, he had just picked out Moorer's photo from "books" of photos before he picked him out of the photo array he signed. AF, 100.  In sum, the photo array and lineup were suggestive and not reliable.  Further, the fact that Moorer's weight was so different than the described offender and that it was the only somewhat specific description made the lineup less reliable.

### 2. IMPROPER POLICE PROCEDURES ALSO CONTRIBUTED TO THE SUGGESTIVE AND UNRELIABILITY OF THE LINEUPS

Mr. Signorelli, a lawyer and a retired member of the NYPD, holds various positions including doing investigations of various criminal activity. AF, 81. He formed opinions regarding police procedures in this case. His opinions generally include that the lineup identifications were not reliable and that there was a "rush to judgment" to charge Moorer in less than 24 hours after the crime had been committed. AF, 82. He also opined that there were significant problems with the identifications of Moorer. AF, 86-89. According to Signorelli, the fact that there were so many factors that indicated that Moorer was not the offender, is a

significant reason that the defendants knew that the identifications were not reliable. AF, 82. This included that Moorer did not have any injuries consistent with having been in a fight. Moorer also was not a fat 250 pound guy as described by the witnesses, his nickname was not "Boom," he did not own the phone that was associated with "Boom," and alibi witnesses placed Moorer in another location. Finally, there is no reasonable reliability because the forensic evidence exculpated Moorer. AF, 81, 83 85,86.

Additionally, Signorelli opined that the lineup procedures were flawed, and the identifications made were also unreliable for these reasons. Signorelli referenced the Department of Justice guidelines and ABA guidelines for eyewitness identifications. AF, 86. There were two related problems with the lineup procedure. First, contrary to the guidelines, the fillers in both the photo array and live lineup did not look like the description of the offender given by the witnesses. The fillers in both lineups could not be reasonably described as huge, "fat" or 250 pounds as described. Also, the guidelines indicate that the suspect should not unduly stand out among the persons in the lineup.  In the photo array, Moorer appears to be the largest individual in the array, and he stands out. AF, 86. The size of the offender was key to the witnesses' identifications and so this was the significant feature that differentiated him. Also, the 3 top people in the array appear to be bald and Moorer is not bald, nor did any witness describe him as bald, so that immediately eliminated 3 of the 6 persons in the array. AF, 87.

In the live lineup, Moorer is wearing the darkest clothes, as all the witnesses described, and the fillers are not wearing dark clothes. AF, 87. In addition, Moorer was not placed in different positions in any of the photo array and live lineups as the guidelines require. AF, 88. Further, Moorer was the only person in the live lineup that was also in the photo arrays, thus making this suggestive. AF 84. Additionally, as testified to by Loftus and Signorelli, there was

no independence of the witnesses in doing the lineup identifications. AF, 71,89. Delia Rivera

testified that she, Jacklyn, Alina and Walter all sat together in the hallway at the station just prior

to the photo arrays and "Wally" told them about a "large black man" with whom Edward had a

prior incident. RSOF, 49.  She testified that "Wally said that the shooter "was a large black

man." *Id.* At that time, she also learned that Edward had an incident with a large black man.

Similarly, Defendants Cardo and Gonzales testified that as the witnesses arrived to do the

physical lineups, they were sitting in the hall together. AF, 89. In sum, when the facts regarding

unreliability are considered in total, there was many factors that made the identifications

unreliable.

### 3.   DEFENDANTS' EXPERT'S OPINIONS ALSO SUPPORT THE UNRELIABILITY OF THE LINEUP

Dr. Wixted was Defendants' expert regarding eyewitness identifications. The entire focus

of his opinion is that a witness who makes a highly confident identification, in a "fair" and initial

lineup, is likely to be an accurate and thus reliable identification. AF, 97. According to Wixted,

the only variable that is important is whether the witness made a highly confident identification,

in his initial identification of a fair lineup. AF, 98. A fair lineup is one in which the facial

features of the persons in the lineup, the suspect and the fillers are similar. AF, 98. In the lineup,

everything should match as much as possible (e.g., weight, clothing), but facial features are the

most important. AF, 98. Also according to Wixted, to be accurate about the lineup and

confidence of the witness, the confidence level must be recorded at the time that the lineup was

done and this was not done here. AF, 98.  Wixted refers to "estimator variables" as the

conditions under which a witness views an offender during a crime (for example, lighting

conditions, stress level, cross-racial identifications). Wixted testified that the "worse the

estimator variable, the less likely to form a memory of the perpetrator." AF, 99. Wixted also

agreed that in this case it "sounds reasonable" to put in pictures of people that are fat or 250 pounds into a lineup if that is what they are describing. AF, 101. Wixted also testified that there are "zillions" of cases in which multiple witnesses misidentify the offender. In other words, it is common. AF, 102. Thus, the fact that there were 7 eyewitnesses here is not determinative of anything.

Finally, Wixted testified about a study he participated in with the Houston police department. AF, 102. He indicated that the study showed that high confidence identifications were highly correlated with corroborating evidence. AF, 102. Here, there was virtually no corroborating evidence. Also, with regard to that same study, Wixted testified that high confidence identifications are relatively infrequent and happened in the Houston study only a quarter to third of the time. AF, 102. This latter factor dovetails into a point made by Loftus. In response to any contention that the eyewitnesses in this case all made high confidence reliable identifications, he indicated in his report that: "in my experience of working in more than 1,500 criminal cases would have suggested to me that it was not particularly easy for seven witnesses to all acquire good enough memories of the offender's appearance to be able to confidently identify him from a photospread." AF, 79. Loftus also stated that: Accordingly, the presumption that the seven witnesses made their high confidence identifications based on seven strong and complete memories of the offender strains credulity. In my opinion, it is more reasonable to presume that their uniformly high-confidence identifications were instead based on biases in the identification procedures, as I discussed in some detail in my original report and as I briefly sketched above. AF 77.

**4. THERE WERE MANY IMPROPER POLICE PROCEDURES**

According to Signorelli, there were significant police practices that were wrong, that lend themselves to the further conclusion that the Defendants had something to hide and that the identifications were not reliable. There were two major issues related to this. First, is that Edward's phone is missing. This is significant because of the likelihood that the phone contained significant information that could and likely would have exculpated Moorer. AF, 90-92. Information could include various forms of social media, including pictures, text messages, emails, voicemail, and GPS information. The phone was not even inventoried as police practices require. AF, 91. Additionally, that there is no report of how Moorer came to be a suspect to be included in the photo array, is contrary to police practices. AF, 93. Police practices require this documentation. Also, the documentation of this was not preserved; for example, the computer search of the nickname "Boom" (if one even occurred) was not printed out and preserved, and any photos that Defendants' claim were shown to Edwin have not been preserved. AF, 93.

Mallul, Defendants' police procedures expert, also agrees with this latter opinion, as well as the fact that it was a violation of proper police practices not to have inventoried and preserved the phone. AF, 106. Other procedures that were not followed was that Detective Leal claims that he circled Moorer's picture when Alina was doing the photo array. This is contrary to both CPD and general police practices. AF, 94. The Defendants also did not obtain a search warrant or request to search Moorer's residence. AF, 95. Evidence of the crime, if it existed, such as blood transfer, or bloody clothes, could be there and searching his residence could help to confirm or not probable cause to arrest Moorer. AF, 95. There is also no report of the Defendants' doing any investigation of the suspect identified as "Zebo." AF, 95. He was thought to be either the number 1 offender or Moorer's cousin. To have determined if "Zebo" was really Moorer's cousin, could

have helped to confirm or not probable cause for Moorer. AF 89. In sum, the failure in these police procedures leads to inference that the investigation was done improperly and in a biased manner.

## H.  MCDERMOTT'S AND FOLINO'S BACKGROUND REVEALS A BIAS AND A PATTERN OF MISCONDUCT

The backgrounds of both Defendants McDermott and Folino are relevant to the claims. With regard to McDermott, he was terminated from the CPD because of a racist photograph that was taken of him, with another officer (already terminated for different reasons) and an arrestee. The arrestee is African-American and was made to pose with deer antlers on his head and McDermott posing next to him with a rifle, as if the arrestee was a mere animal who should be shot. AF, 105.

Also, both Folino and McDermott were the primary defendants in another recently published case involving misconduct in the context of lineup identifications. AF, 103. *Kuri v. Folino* et al., 409 F.Supp.3d 626 (N.D. 2019), *affm'd* 990 F.3d 573 (7th Cir. 2021). That case arose out of a 2009 incident (one year before this case) in which there were many striking similarities. Similarities include that there were multiple identifications/photo-arrays that were discredited, the means by which the suspect was initially discovered was allegedly a nickname search, and there was a dispute on how the suspect became initially identified. AF, 103. The Plaintiff won a large verdict in that case and both Folino and McDermott had sizable punitive damages awarded assessed against them. AF, 103.  In addition to the foregoing, both McDermott and Folino were sued for a false arrest in the context of another murder investigation that occurred in 2006. AF, 104. There were allegations of a coerced confession and this case settled. *Wilson v. Smith et al.*, case no.: 08 CV 1702. AF, 104.

Contrary to what the District Court said in this case, both Defendants, particularly McDermott, were very much involved in this case. As documented in the facts above, McDermott was the Detective last documented with the now missing phone; he briefed Cardo and Gonzales about the state of investigation; he went and "interviewed" the alibi witnesses along with Folino; he wrote the Scene Report; he attended unrecorded interviews of all the eyewitnesses; he put out the investigative alert; and he was repeatedly searching in the computers for Moorer's mugshot after 4:40 am. AF, 40. As a result of the foregoing, the credibility of both McDermott and Folino are in question, and this should impact the analysis in connections with the issues just identified.

### III.     SUMMARY OF ARGUMENT

The Plaintiff spent roughly 7 years in jail on murder charges until he was acquitted in a criminal jury trial notwithstanding 7 eyewitnesses (6 of whom testified). He was arrested based upon 7 eyewitness identifications.

Plaintiff's argument is that probable cause did not exist because no matter how many eyewitnesses professed to identify the Plaintiff, each of the identifications were either coached or were accompanied by descriptions of the event that would have been physically impossible for them to see, or facts about the offender were wrong, or by identifications that could not have been relied upon because the witness did not see the offender. The unreliability was further confirmed and highlighted because when Thomas Moorer ("Moorer"), was arrested, many facts emerged that showed he was not the offender.

The District Court made many rulings that Plaintiff has argued are incorrect. Above, all, the Court did not analyze this case under the proper "reliability," totality of the circumstances, probable cause determination framework; rather it looked to "coercion and manipulation" of the identifications which is not the correct framework to show a lack of probable cause. The Court

also wrongly deemed "admitted" the eyewitnesses' identifications, because the Plaintiff

challenged the reliability and credibility of the identifications, but that was not considered to be

"responsive" to the Statement of Facts setting forth a purported identification.  The Court also

completely disregarded Plaintiff's experts indicating it did not matter because the underlying

facts were undisputed.  This is wrong because the underlying facts were disputed, but also, there

is a difference of opinion and competing inferences to be drawn from the facts.

## IV.     ARGUMENT

### A.  STANDARD OF REVIEW

This Court is to review the district court's grant of summary judgment *de novo,* and

examine the record and all reasonable inferences in the light most favorable to the Plaintiff.

*Spurling v. C & M Fine Pack, Inc.,* 739 F.3d 1055, 1060 (7th Cir.2014).

In deciding whether there is a genuine issue for trial, the court must construe the facts in

the light most favorable to the non-movant and draw all reasonable inferences in favor of the

non-moving party. *Dumas v. Infinity Broad Corp.*, 416 F.3d 671, 676 (7th Cir. 2005).

Additionally, on summary judgment, a Court may not make credibility determinations, weigh the

evidence or decide which inferences to draw from the facts. *Washington v. Haupert*, 481 F.3d

543, 550 (7th Cir. 2007).

### B.  THERE WAS NO PROBABLE CAUSE TO ARREST THE PLAINTIFF

Probable cause to arrest someone is defined as "a common-sense inquiry requiring only a

probability of criminal activity; it exists whenever an officer or a court has enough information

to warrant a prudent person to believe criminal conduct has occurred." *Whitlock v. Brown*, 596

F.3d 406, 411 (7th Cir. 2010) (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13, 103 S.Ct. 2317,

31

76 L.Ed.2d 527 (1983)). It is "assessed objectively" based on "the conclusions that the arresting officer reasonably might have drawn from the information known to him." *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007); *see also, Young v. City of Chicago*, 987 F.3d 641, 644 (7th Cir. 2021).

Probable cause is an objective inquiry, accounting for all the information available to an officer at the time, *id.* at 644. Important to this case is that the *touchstone of that inquiry is reliability*. *See Hurt v. Wise*, 880 F.3d 831, 841 (7th Cir. 2018) ("Reliability ... is the gravamen of probable cause."), *overruled on other grounds by Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019). *Gray v. City of Chicago*, 18 C 2624, 2022 WL 910601, at *9 (N.D. Ill. Mar. 29, 2022). Probable cause is determined under a totality of the circumstances approach. *Illinois v. Gates,* 462 U.S. 213, 214, 103 S.Ct. 2317 (1983).

Similarly, when eyewitness identifications account for the basis for probable cause, the reliability and credibility of the eyewitnesses is the "touchstone" of probable cause because an officer must first reasonably believe that the victim is telling the truth. *Woods v. City of Chicago*, 234 F.3d 979, 987 (7th Cir. 2000)." *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009). The issue of the reliability of an identification "is determined by the totality of the circumstances, including his "opportunity ... to view the criminal at the time of the crime, [his] degree of attention, the accuracy of [his] prior description of the criminal, the level of certainty [he] demonstrated at the confrontation, and the length of time between the crime and the confrontation." *Smith v. Arteaga*, 2010 WL 3894099, at *4 (N.D. Ill. Sept. 30, 2010), *quoting Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

Also, relevant to this case is that "an officer may not close his eyes to facts that would clarify the situation and defeat probable cause." *Young v. City of Chicago*, 987 F.3d 641, 645

(7th Cir. 2021). Further, the probable cause determination" must be made by a jury if there is room for a difference of opinion concerning the facts or reasonable inferences to be drawn from them." *Kuri v. Folino,* 409 F.Supp.3d 626, at 646-647, *citing, Chelios v. Heavener,* 520 F.3d 67, 686 (7th Cir. 2008).

Finally, the need for probable cause to detain is present throughout the detention. If it develops that probable cause no longer exists sometime after a detention has begun, the Fourth Amendment is violated. See, *Michell v. City of Elgin*, 912 F.3d 1012, 1015 (7th Cir. 2019). This is important here because DNA evidence further negated probable cause to detain Plaintiff when it was found to have excluded Plaintiff from the crime scene.

A "totality of the circumstances" in this case comprises several different categories of evidence. Each one of them individually, and especially combined, shows that there was no reasonable probability that Plaintiff was involved in the murder that occurred on August 28, 2010. These categories of evidence bearing on probable cause, discussed in the statement of facts *supra,* include:

- The poor viewing conditions that existed to view the crime, resulting in the description of the perpetrators, beyond being a black male in his late 20s, being nearly non-existent.

- The details of the eyewitness identifications which show that for each witness there was a specific reason to doubt their reliability. For some witnesses, statements were made about the event that they could not have physically seen (Delia, Alina, Walter, and Miguel); that Edwin was coached to pick Moorer's photo out of the array, and that he got the details about Moorer incorrect (his nickname and phone number); that Jacklyn barely gave any description and admitted that the offender's face was covered the entire time she saw him; and that Eliezer's

description was far afield of the others, and he said he picked Moorer in the lineup and he had a fresh scar on his arm that did not exist.

- That upon arresting Moorer, numerous facts that were learned showed that he did not commit the murder, including him having the wrong nickname, wrong phone number, lack of injuries to his body, and that he did not appear as described by the witnesses.

- That there were alibi witnesses that were disregarded, and not pursued.

- That expert witnesses found the lineups to be suggestive and unreliable.

- That the police engaged in improper police procedures and "lost" evidence.

- DNA evidence showed that Moorer was not at the scene.

- There was not a single fact to corroborate that Moorer was involved in the murder.

When all of these things are considered in total, there clearly was no probability that Moorer was involved in the crime.

The District Court was wrong in its decision because it did not consider many of the relevant facts. Further, the facts it did consider were taken out of context of their relationship to other facts rather than being considered as a totality, and by not using reliability as the touchstone for its analysis, the wrong legal standard was used.

### C. THERE WERE MULTIPLE ERRORS BY THE DISTRICT COURT THAT WRONGLY IMPACTED THE "TOTALITY OF THE CIRCUMSTANCES" IN ANALYZING PROBABLE CAUSE

#### 1. THE COURT'S LEGAL FRAMEWORK FOR ANALYZING THE EVIDENCE WAS INCORRECT

Beginning at page 21 of its opinion, the District Court set forth the legal framework that it used to test the Defendants' motion for summary judgment. The Court's analysis was mistaken because it focused on whether the Plaintiff can show that identifications were the

product of "coercion or manipulation," rather than reliability.  Dkt. 177, at 21.  Relying on *Hart v. Mannina,* 798 F.3d 578 (7th Cir. 2015) throughout its opinion, (*see e.g.,* Dkt. 177 at 28, 31, 32, 34, and 35) the Court noted that a single identification from a credible eyewitness is sufficient for probable cause.  The Court also stated that "Moorer must show that defendants "used a forbidden technique 'to trick a person into making an unreliable identification."  *Id., quoting, Phillips v. Allen,* 668 F.3d 912, 915 (7th Cir. 2012).  The Court also disagreed with Plaintiff that it was appropriate to assess the case using the "two-step process used in the Due Process context, …that is not the test for probable cause under the Fourth Amendment."  *Id.  citing Phillips supra* at 915. Dkt. 177, 21.

Reliance solely on the above cases and their analyses, do not address issues that are at play here.  As noted above, "reliability not coercion" is the touchstone of probable cause.  *Hurt, supra* at 841.  The totality of the circumstances is what is to be analyzed.  The overall big picture that the District Court missed about *Hart, supra,* is that in that case, when it turned out that the one witness who had identified one of the criminal defendants in the underlying criminal case proved to be unreliable, that defendant was dismissed by the criminal court. Plaintiff Hart was not dismissed initially because there were 3 other witnesses who had also identified him.  But notably, when Hart obtained additional evidence, much like the additional evidence in this case, that is, phone records, alibi information and no forensic evidence connected him to the crime, the underlying criminal court dismissed him as well.  *Hart supra,* at 588.  Thus, the inference in *Hart* is that when it became apparent that probable cause no longer existed because of information that came to light at some point after the arrest, the case was dismissed, as it should be.  The same should have happened here.  That is, when evidence regarding Plaintiff's nickname, the phone number, the forensic evidence, the alibi evidence, and the many other

factors that became known, Plaintiff's case should also have been dismissed- there could not be said to be probable cause to continue detaining Moorer in light of all these facts.

Also, the "forbidden technique" test that was stated in *Phillips* was not held as a requirement for all cases in all circumstances. But rather, it was relevant to that case because there were no other reliability issues with the eyewitnesses, and that Plaintiff alleged that a "forbidden technique" or trick was being used. Notwithstanding *Phillips*, the test in all Fourth Amendment cases is reliability. Further, and expressly stated in *Hurt supra*, it is *reliability*, and not coercion and manipulation, as was used by the Court in this case, that are at issue and should be examined. *See also, Gray v. City of 'Chicago,* 2022 WL 910601 (N.D. 2022) (Evidence that the lineup was not consistent with national guidelines, without reference to a "forbidden technique" could result in a jury concluding that the lineup was not reasonably reliable.)

### 2. THE COURT WRONGLY DEEMED THE IDENTIFICATIONS OF PLAINTIFF AS "ADMITTED" DESPITE MANY FACTS CHALLENGING THEIR CREDIBILITY AND RELIABILITY

The District Court wrongly deemed several identification facts as admitted. Plaintiff responded to some of Defendants' Rule 56.1 Statement of Material Facts, not by denying the verbatim fact that it happened, but rather by challenging their reliability and credibility. The District Court acknowledged that Plaintiff's response includes facts that "speak to the unreliability and inconsistency of the witnesses' identifications,"…but that these facts "aren't fairly responsive to the asserted fact [of the identification]." Dkt. 177, fn. 14. As a result, the Court determined that Plaintiff did not controvert the fact that eyewitnesses, Hernandez, Edwin, Miguel, Rivera, and Kindelan identified Moorer as being involved in the crime "and so that fact is undisputed and admitted." *Id.* The ruling in this footnote permeated the Court's entire

opinion, and as a result, the Court did not correctly analyze the reliability and credibility of the witnesses throughout its analysis.

This ruling was wrong because the fact that the Defendants reported that they made identifications does not mean that they did, and the fact that there was evidence that the identifications were wholly unreliable or tainted because they were coached or accompanied by statements that would have been physically impossible for the witness to have known, made the identification not meaningful. For example, if a witness identifies an offender who is standing in an array and is 4'5" tall, but video shows the offender to be 6'5", no one would disagree that the witness picked the short person, but nobody would reasonably agree that an "identification" had been made.

Similarly, here, a look at Plaintiff's responses shows that certain of the witnesses indicated in Defendants' Statement of Material Fact, number 68 (Delia, Miguel and Alina), made statements about their identifications that were physically impossible. For example, as noted above, Delia never entered the apartment where the shooting occurred, but yet, identified Plaintiff as the "male who shot the gun, the first male." RSOF, 68. If a stated fact of an identification is shown to be impeached because it was accompanied by statements that were physically impossible for the witness to know, there is a lack of any meaningful credibility, and this implies that the "identification" did not take place. The only way that Miguel or Delia could state that Moorer was the shooter was for somebody to tell them he was the shooter – they did not see the shooting. But, that is not an "identification" that is meaningful, or one that Plaintiff would reasonably admit to. Plaintiff respectfully submits that such a response that impugns reliability is responsive to the fact presented. Similarly, if Plaintiff produces evidence that Edwin was coached, Plaintiff is not going to admit to his identification. RSOF, at 66.

As a result of this ruling, the Court did a very truncated analysis of the reliability and credibility of the identifications and did not consider, for example, that most of the witnesses' statements about the event were physically impossible.  *See* Dkt. 177, at 22-23.  At repeated times throughout the Rule 56.1 process Plaintiff pointed to facts that impeached the reliability and credibility of the identifications themselves.  *See e.g.,* Dkt. 164, no. 50 (documenting that the witnesses gave only very vague descriptions all of which amounted to the description being big, black and fat, to counter Defendants' fact that the witnesses described the offender); *Id.*, at 53 (Edwin's credibility issues were noted because the first description from the hospital (likely from Edwin) was that the nickname of the offender was "Zebo," subsequently, this changed to "Boom"); no. 93 (Delia wrongly describing the offender with "dreads"); and no. 95 (Jacklyn did not see the offender's face because he was wearing a mask).  The responses made were responsive to the fact stated to be undisputed as the rules require.  Similarly, if a jury were confronted with the "fact" that an eyewitness picked a person in a lineup, the jury might not deem it as an "admitted" "identification" if unreliable. Clearly the criminal jury in the underlying case obviously took the same approach here in acquitting Moorer-despite the supposed identifications.

There are *many* other facts discussed below that challenged the reliability and credibility of the identifications, but the court either did not address them, and/or determined that Plaintiff's expert testimony was not to be considered, and/or determined that "reliability" did not matter if the evidence did not show the statement to be coerced or the product of a "trick". These are all dealt with below.

## 3.  THERE IS A TRIABLE ISSUE AS TO WHETHER THE POLICE SHOULD HAVE DISCOUNTED THE WITNESSES' IDENTIFICATIONS.

With regard to the reliability of the eyewitnesses, the Court found as a matter of law that the "inconsistencies and challenges of the witnesses' perception didn't make the witnesses so unreliable that the officers could not believe them." Dkt. 177, at 22-23. In arriving at this conclusion, it is apparent that the Court did not consider much of the evidence. The evidence it did consider was limited to poor viewing conditions, the mask being worn by the offender, and two witness inconsistencies. *Id.,*

Evidence not considered by the Court were the very vague and limited offender description (which likely applied to a large portion of the black population on the west side). Also, most importantly, four of the witnesses stated things about the event that they could not have seen, another witness could not see the offender's face because she only observed him with his mask on, and another witness (Edwin), was coached to initially identify Moorer. If it is not enough to determine a witness might be unreliable when they describe things about the event that they could not have seen, then what is? Also, all of the witnesses' description of the offender was of a big, fat, roughly 250-pound person, and Moorer was not that person. *See Jones v. City of Chicago,* 2020 WL 6126161 (N.D. Ill. 2020) citing to *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2559, 201 L. Ed. 2d 986 (2018), noting that in assessing the reliability of an identification, an important factor is the accuracy of the prior description.

But, also not considered were the numerous facts about Moorer learned upon his arrest (different nickname, no phone, no bruising on him, alibi witnesses, different getaway car, and more). Comparatively in *Hart, supra,* cited by the District Court, none of the eyewitness were reported to have seen things they could not have seen, and their descriptions were consistent with the person arrested. Further, the fact that Edwin gave the wrong nickname (Boom, not Boomer) and a phone number not associated with Moorer should have been a huge red flag about his

reliability, and especially important since Edwin's statements are what somehow originally led the defendants to placing Moorer in the photo array.  These additional factors are similar to those that caused the Court in the underlying criminal case in *Hart* to dismiss the criminal case against him when these very similar facts were learned- in the face of four eyewitnesses.

Corroboration of guilt is also an important factor in determining the reliability of an eyewitness identification.  *See e.g., Illinois v. Gates*, 462 U.S. 213, 246, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (explaining that "corroboration of ... [a tipster's] predictions" of a suspect's future legal conduct supports the truth of the allegations).  Citing to the Seventh Circuit, one court stated that:

> Significantly, after *Brathwaite,* many courts have continued to consider other proof of guilt in deciding whether to admit eyewitness identification testimony. An in-court identification was judged reliable by the Eighth Circuit, in part because two other government witnesses identified the defendant, including the driver of the getaway car. *United States v. Rogers,* 73 F.3d 774, 778 (8th Cir.1996). As the panel explained, the "additional testimony diminishes any likelihood of irreparable misidentification." *Id.* Similarly, in evaluating the reliability of eyewitness identifications in a drive-by shooting, the Seventh Circuit explained that "[c]orroborated eyewitness testimony is much less suspect than one individual's visual impression." *United States ex rel. Kosik v. Napoli,* 814 F.2d 1151, 1156 (7th Cir.1987). The Seventh Circuit then proceeded to consider, along with the *Biggers–Brathwaite* factors, that a car like the one eyewitnesses described was registered to the defendant, that two other witnesses who did not make identifications gave descriptions of the driver that fit the defendant, and that the shooting took place in the defendant's neighborhood. *Id.* at 1156–57, 1161.

*Brisco v. Ercole*, 565 F.3d 80, 98 (2d Cir. 2009).

Here, not only was there zero corroboration, but other evidence in the case was very suggestive that Plaintiff was not at the crime scene.  These facts clearly make the identifications much less reliable, much like in the *Hart* case, which caused the criminal court to dismiss the criminal cases against those defendants.  The District Court did not consider this at all, and

40

Plaintiff submits that it was error not to consider it. The Court should have discounted the identifications, as a jury would have done in these circumstances. Plaintiff is doubtful that a Court would say that was unreasonable had the case gone to trial and a jury made this finding.

### 4. THE COURT'S ANLAYSIS INTO WHETHER THE IDENTIFICATIONS "WERE COERCED OR MANIPULATED" WAS LEGALLY AND FACTUALLY INCORRECT.

The District Court's analyzed much of the evidence focusing on whether the identifications could be said to have been "coerced or manipulated." Dkt. 177, at 23-32. This framework to look at the evidence was legally incorrect because the focus on a Fourth Amendment case of probable cause to arrest, as just stated above, is that "reliability, not coercion, is the gravamen of probable cause." *Hurt supra*, at 841. Even the District court in this case, in a previous decision on Rule 12(b)(6) motion, observed that Plaintiff will need to prove that "it was *unreasonable* to credit the eyewitness identifications,…" *Moorer v. Platt*, 2020 WL 814924, at *3 (N.D. Ill. Feb. 19, 2020).

As a result of the law on the issue of probable cause, Plaintiff's entire opposition brief to the District Court focused on the reliability of the eyewitnesses in the context of the factual evidence that was relevant. The District Court though, in its Memorandum Opinion focused on "coercion and manipulation" and not reliability. In doing so, the Court repeatedly did an analysis of facts that Plaintiff claimed proved the evidence to be unreliable, and then dismissed it, because either Plaintiff did not prove the procedures were designed to have him selected (Dkt. 177, at 27), or that the police officers did not use a "forbidden technique (*id*., fn. 32), or that Plaintiff "hasn't pointed to any constitutionally forbidden technique… to coerce or manipulate every eyewitness into identifying him." (*Id.,* at 32*)*. The evidence should have been analyzed, however, through the prism of determining whether it was reasonably reliable.

Thus, for example, the Court looked at the issue of the fillers in the lineups weighing much less than the description of the perpetrator given by the witnesses. The Court recognized that the fillers in the array were 175-195 pounds (and appeared even lighter in the live lineup), and that was much different than the fat or 250-pound description given by the witnesses. Dkt. 177, at 24-25. Nevertheless, instead of analyzing to determine if that was a factor that would indicate unreliability, see, *Neil v. Biggers* - 409 U.S. 188, 199 93 S. Ct. 375 (1972) *(person described being much different than the suspect might be unreliable),* the Court determined that the deviation "does not support an inference that the officers chose the fillers in an intentional effort to produce an identification they knew to be incorrect." *Id., at* 25. But, clearly if the sole description, other than black and male, is so different than that described, the deviation does raise issues of unreliability.

This was also an example, among many, of the Court not giving Plaintiff the benefit of a reasonable inference. Police guidelines and common-sense demand that Police use fillers that are similar to the description of the offender. In fact, Detective Tedeschi testified and CPD policies generally demand that in creating a photo array, an officer queries demographics by inserting the relevant demographics, including height and weight. AF, 29, 35. As a result, also, common-sense dictates that since the description given of the offender was generally fat or huge or 250 pounds, the demographics inserted into a request to create a lineup would include fat 250-pound persons. It did not; as noted by the Court they were far less than 250 pounds. A reasonable inference is that this was intentional because it is such an obvious inconsistency in the description of the offender and the weights of the fillers, in the context of how demographics are used to create a photo array. That inference should have been resolved in Plaintiff's favor, and at the very least should have impacted the "reliability" analysis.

Similarly, when looking at the claim the photo array was suggestive because Moorer appears to be the largest person in the array (and again, no filler would be deemed to be "fat" or 250 pounds), the Court did not look at reliability. Rather, in rejecting the problem with this issue, the Court stated that "the weight or size differential is not evidence from which a jury could conclude that the officers designed the lineup to *trick* the eyewitnesses…" Dkt. 177, at 26. Plaintiff respectfully disagrees. Again, the Court examined the fact that Moorer was the only person in both the array and the live lineup and acknowledged that this was suggestive, but "not a forbidden practice." *Id.,* at 27. That is simply a truncated analysis. Just because it is not "a forbidden practice" does not mean a jury could not conclude that the array was designed to trick jurors, nor does it mean that a jury could not conclude that the array was unreliable.

In this context, the Court also examined the fact that the officers appeared to use the photo array to confirm Edwin's initial identification by showing him the array (right after he viewed some as yet unknown pictures) pointing to a picture, and asking him: "is this the person you picked out?" The Court stated in a related footnote that while "the initial identification from among the database results may not have followed best practices, police officers didn't use an already forbidden technique…" Dkt. 177, Fn 32. But, acknowledging that this is problematic, in the same context, the Court stated that even if this procedure was coerced, the "use of a forbidden technique of telling Edwin who to identify doesn't taint all the other identifications." *Id.,* at 29. What the Court did not do is recognize that this impacts the reliability of not only Edwin's array identification, but also his live lineup identification because Moorer was the only person in both lineups. Additionally, if the police are acting improperly coaching a witness in one identification, it is not unreasonable to infer that something happened with other witnesses

43

that put a Defendants' thumb on the scales.[9]  *See Hart, supra* at 590 ("We recognize the possibility that circumstantial evidence concerning a later interview may be so compelling as to permit a reasonable inference that the police used an improper technique during an earlier interview.")  As a result of the foregoing, Plaintiff submits that there was substantial evidence from which a jury could find that the eyewitness identifications were not reliable, and along with the other evidence, that there was no probable cause for Plaintiff's arrest.

### 5.  THE COURT'S CONSIDERATION OF "OTHER PROCEDURAL PROBLEMS, MISSING EVIDENCE, AND EXCULPATORY EVIDENCE" WAS IN ERROR

The Court took pains to look at all the procedural problems and missing evidence, acknowledging that there were problems, but in every instance, excused it not recognizing that these problems created issues that a jury should be called upon to resolve.  Dkt. 177, at 32- 38. The Court looked at many of the problems and most often just disregarded them, including, that "Moorer is right that it's not entirely clear how he became a suspect,"[10] police failed to save the nickname search, and "the timeline of events leading up to the photo array identifications doesn't make sense,…"  *Id,* at 33.  The Court concluded this by stating that flawed police work is not enough to draw a negative inference.  However, this is not just a little bit of flawed police work. In fact, it is difficult to identify any police work that was not flawed in this case.

From the beginning of the investigation to the end there was flawed police work.  When Edward's cell phone was found, and found to have significant evidence, it was promptly lost.

---

[9] For example, Jacklyn's description was nearly non-existent, and she did not see the offender's face because a mask covered it.  How is it possible, under these circumstances, that she could pick Moorer? This is especially problematic since her photo array occurred at 1:35 am – 25 minutes before Edwin's (at 2:00 am), and before the photo array could have been even assembled given the timeline.

[10] The Court contradicted an earlier statement wherein it stated that "Moorer alleges that its not known how he came to be a suspect in the first place…but the record doesn't fully support that allegation." Dkt. 177, Fn 11.

Edwin, upon who the identification of Moorer was based, was coached to pick Moorer in the photo array he was shown; the photo arrays themselves had no fillers who looked consistent with the description of the offender in that none were fat; known *accessible* alibi witnesses were not interviewed despite alibi witnesses putting Moorer at another location; in the course of the witnesses' subsequent statements and live lineups, witnesses made statements about their observations that were physically impossible, but ignored; police failed to search Moorer's residence for evidence of a crime or do a gunshot residue test,[11] and DNA evidence was disregarded. Based upon all this and more, the flawed police work was more than just an incidental thing.

      Also, the Court stated that "Plaintiff does not point to any evidence that McDermott knew the phone contained information that would exculpate Moore…" *Id.*, at 35. But, in a related footnote, the Court states that Plaintiff argues that the phone had exculpatory value for 3 separate reasons, including that "Edwin said that Boom had called or texted his brother prior to the murder." *Id.,* at Fn. 40. Curiously, the Court then stated that it is "reasonable to infer that McDermott knew the phone contained this evidence, but Plaintiff hasn't shown that this evidence was lost or concealed." However, *it was "lost"*; there is no disputing that it was lost. Moreover, it was known to contain exculpatory evidence – text message records, phone records, the nickname of and the phone number of the person who committed the crime.[12] Since, a "police officer's duty to preserve evidence applies when the officer…knows the evidence is exculpatory," this duty has been violated and appropriate negative inferences should have been given. *Hart v. Mannina supra*, at 589.

---

[11] These issues were all noted in expert Signorelli's opinions regarding police procedures. AF, 95.
[12] Police had already successfully pinged the phone's location. Why did they just not continue to do that until they located the person who possessed the phone?

The Court also acknowledged all the factors that indicated Moorer did not commit the crime. For example, a different nickname, phone and no bruising on him at the time of this arrest. The Court disregarded this by stating that this "evidence did not undermine Defendants' probable cause to detain Moorer which was based on identifications by seven different witnesses." Dkt. 177, at 36. Plaintiff respectfully submits that a jury could look at this evidence, the quality of the identifications, and the poor police procedures, as it should under a totality of the circumstances test, and clearly determine that this evidence did undermine probable cause.

The Court also referenced, in a footnote that the DNA evidence had exculpated Moorer. Dkt. 177, Fn. 41. The Court disregarded this by stating that this "was tested well after Moorer had been charged by the state's attorney…and so the DNA analysis couldn't have undermined defendants' probable cause at the time Moorer was detained." Dkt. 177, Fn. 41. This is incorrect. The Fourth Amendment provides that an arrest and continued detention must be supported by probable cause. If probable cause existed initially but fell away because of the development of other evidence, then a claim exists. *See, Michell v. City of Elgin*, 912 F.3d 1012, 1015 (7th Cir. 2019). Certainly, the discovery that the DNA evidence excluded Plaintiff is relevant to that analysis.

## 6. THE COURT WRONGLY DETERMINED THAT FACTUALLY SIMILAR CASES WERE INAPPLICABLE RESULTING IN DISREGARDING CERTAIN SIGNIFICANT EVIDENCE

In a footnote, the Court determined that the cases of *Sanders v. City of Chicago Heights*, 2016 WL 2866097 (N.D. Ill. 2016) and *Kuri v. Folino* 409 F.Supp.3d 626 (N.D. Ill.), *affm'd Kuri v. Folino,* 990 F.3d 573 (7th Cir. 2021) are inapplicable. In both cases, the Court determined that the cases are distinguishable because the former addressed claims in a Fourteenth Amendment

context, and the latter was addressing post-trial motions.  Dkt. 177, Fn. 36.  The Court is wrong because in both cases the principles and law apply equally to this case.

 *Sanders* involved Fourteenth Amendment claims in the context of a wrongful conviction and eyewitness identifications.  Plaintiff cited Sanders extensively in connection with the proper way to analyze the reliability of eyewitness identifications, and violations of police procedures.  In *Sanders,* the Plaintiff used two experts to show that a photographic array and lineup were outside of generally accepted professional standards.  The Court indicated that in doing so, in circumstances very factually similar to this case, the Plaintiff raised a reasonable inference that these identification procedures were unnecessarily suggestive."  *Id.* at *9, citing Jimenez v. City of Chicago,* 732 F.3d 710 (7th Cir. 2013).

 The fact that *Sanders* was a Fourteenth Amendment claim does not make it inapplicable here, because the same issue, reliability of eyewitness testimony, is the factual issue being addressed, and that issue is the same in Fourth Amendment cases where the reliability of the facts giving rise to probable cause are at issue.  In fact, many cases have discussed the same Fourteenth Amendment eyewitness reliability tests in Fourth Amendment cases.  *See, e.g., Hart supra* at 592 (citing *Neil v. Biggers, supra).*

 Also, many of the same identification problems identified in *Sanders* were identified here.  That includes that the Defendants knew the identity of the suspect, that Moorer appears as the biggest person in the photo array, and that Moorer was the only person in both the photo array and lineup.  *Sanders* at *8-10.  Also, like in *Sanders* there were other similar problems including no blind administrator and no documentation of the photo array procedure.  This is in addition to the many problematic police procedures already identified.  As a result of this, the

Court should have used a totality of the circumstances approach and make use of the factors set forth in *Biggers*, supra, to analyze the reliability of the witnesses.

Related to this is that in another footnote, the Court decided that it would not consider the experts' opinions because the fact "that expert witnesses found the identifications to be unreliable or suggestive is not conclusive because whether probable cause existed based upon the undisputed facts at summary judgment is a question of law." Dkt. 177, Fn. 20.  This statement, as applied to this case, is simply wrong.

Not only has Plaintiff proffered expert testimony, but Defendants have not challenged the qualifications or methodology of the experts, nor did they offer their own expert testimony to rebut Plaintiff's experts.[13]  Moreover, the Court acknowledged that Plaintiff's experts' opinions were useful and admissible opinions because they are more than a "bottom line."  *Id.,* at Fn. 26.

In the Court's analysis of issues relating to reliability, the Court *never* referenced the experts' opinions on the reliability of the identifications, and thus gave no weight to the opinions. It thus did not consider the totality of the circumstances regarding reliability, and in fact, largely failed to analyze whether the testimony was "reliable" as opposed to whether it was coerced or manipulated, and also thus failed to consider appropriate inferences.

### 7.  REASONABLE AVENUES OF INVESTIGATION REGARDING ALIBI WITNESSES AND OTHER MATTERS SHOULD HAVE BEEN PURSUED

There were ambiguities in the evidence that should have but were not pursued.  The only reasonable reason for this is that the Defendants did not want to find out anything that would put doubt into, or undercut their case.

---

[13] Courts routinely consider experts in eyewitness identification cases.  *See e.g., Jimenez supra, Manning v. Buchan,* 357 F.Supp.2d 1036, 1044–45 (N.D.Ill.2004) (Kennelly, J.) (rejecting defendants' request to bar testimony of eyewitness identifications expert who would testify that photographic arrays shown to eyewitness were highly suggestive**).**

An officer "may not close his eyes to facts that would clarify the situation" and defeat probable cause. *Young v. City of Chicago*, 987 F.3d 641, 645 (7th Cir. 2021). That is what happened in this case. The Defendants had the phone number of the murderer and had been pinging its location. They stopped after Moorer was arrested. They easily, as suggested by Plaintiff's experts, could have continued to ping it until they caught the murderer.

Similarly, there were ambiguities about the alibi. The Detectives knew about other alibi witnesses, *had contact with them,* but did not talk to them. That is simply absurd. Under the law a Police officer cannot close their eyes to additional information or investigation if it is reasonably available and could help clarify information they already have. *See, e.g., Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003); *see also BeVier v. Hucal,* 806 F.2d 123, 128 (7th Cir.1986) ("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest. Reasonable avenues of investigation must be pursued…"); *Fox v. Hayes,* 600F.3d 819, 834 (7th Cir. 2010) (police cannot close their eyes to information that undercuts probable cause).

The District Court's analysis in disregarding these issues was wrong. Permitting the police not to investigate because it might undercut their case is wrong. The Court's rationale, that Defendants already had probable cause and were not required to do more rings hollow. Dkt. 177 at 37. In the situation at hand, there were clearly things that needed to be clarified. The Defendants should not have believed that the witnesses were reliable (and therefore, there was no probable cause) given all the problems described above. Given that, and the ease with which the police could have tracked the phone, talked to Moorer's girlfriend, done a gunshot residue test, and searched Plaintiff's residence, it was required. It is a violation of Plaintiff's rights that this

was not done.  They were locking him up for a murder, and just doing a reasonable investigation in light of the consequences of falsely convicting someone is required.

### 8.  PROXIMATE CAUSE HAS BEEN ESTABLISHED

The District Court also determined that the case of *Kuri, supra* was not applicable because that case addressed post-trial motions.  Dkt 177, Fn 36.  That is mistaken because the post-trial motions addressed, included Rule 50 motions, which use the identical standard to that of a motion for summary judgment.  *J.K.J. v. Polk Cnty.,* 960 F.3d 367, 413 (7th Cir. 2020), *cert. denied sub nom. Polk Cnty., Wisconsin v. J.K. J.*, 141 S. Ct. 1125 (2021) ("The showing required for judgment as a matter of law under Rule 50 has been equated with a grant of summary judgment under Federal Rule of Civil Procedure 56.").

Plaintiff relied on the *Kuri* case for several things, since the facts were very similar, and two of the defendants in that case, are also present in this case, and have been alleged to have engaged in similar misconduct.

In determining that Plaintiff did not show that the defendants were the proximate cause of the wrongdoing, the Court did not consider much of the evidence and arrived at inferences inconsistent with what the Court in *Kuri* considered.  The Court also found that there is no evidence that the State's Attorneys were aware of the procedures used during the identifications, the missing cell phone, the continued use of the cell phone, or the impossible timeline of the identifications.  Dkt. 177, at 40.  The Court also felt that it was unreasonable "to infer from those 'flaws' [in the investigation] that the state's attorneys didn't know about aspects of the investigation or that a reasonable attorney in their position would have dropped charges had they been aware." *Id.*

Plaintiff is not required to present testimony from his criminal defense attorney or the trial prosecutor to suggest that the charges would have been dropped. As noted in *Kuri* "the appropriate question is whether a *reasonable* prosecutor under these circumstances would have moved forward with the charges." *Kuri*, at 646, *citing Armstrong v. Daily,* 786 F.3d 529, 554, n. 7 (7th Cir. 2015) ("The appropriate counterfactual to consider is whether a reasonable prosecutor under these circumstances would have moved forward with the charges."). In *Armstrong*, the Seventh Circuit also held that if allegations, or evidence as in this case, support the inference that a reasonable prosecutor in these circumstances would not have moved forward with the charges, then the proximate cause chain is not broken regardless of a grand jury finding. *Id.*, at 553-554.

So, for example, Cardo and Gonzalez arrested and interviewed Plaintiff, not the ASA. AF, at 55. The following is not what is contained in any reports regarding information that the Detectives learned; 1) that Moorer's nickname is "Boomer," not Boom; 2) that he had no injuries on him at the time of his arrest; 3) the description of the car leaving the scene did not match Moorer's car; 4) Plaintiff told them about his girlfriend knowing his whereabouts the previous day;[14] 5) that "Zebo" was the first identified suspect; 6) that Edward's phone with the "Boom" name and number was missing; and 7) that Edwin was coached to initially pick Moorer. *See* Ex. 3 and 5 that contain all the information about the investigation.

Also, what the ASA did not know is that witnesses' statements to them were inconsistent with other statements made not in their presence. That is, that Delia's statement to them that she identified Plaintiff as the one who shot the gun could not be known to the ASA as being something she could not know because she was not in the apartment, as the latter statement was

---

[14] Which was particularly deceptive because all the ASA would know about, were the two alibi witnesses that had very small, but improbable holes in them. The girlfriend would have cleared this up, and if they talked to her, they likely would have dropped the case.

not made in the ASA's presence. Similarly, that Alina stated in her lineup that she identified Moorer as the one holding the gun was not known and compared to the earlier statement where she said she did not see a gun. A similar impossibility is noted for Miguel. AF, at 74. They also could not know about other police procedure problems since the police never documented how they originally identified Moorer, nor could they know that the timeline of how the photo array happened makes no sense and is impossible.

In this case, based upon all the above, as in *Kuri,* there is substantial evidence and reasonable inferences from the evidence to show that a "reasonable prosecutor would have dropped the charges…" *Kuri* at 646. Also, in *Kuri*, the Court found that the jury was free to believe that evidence had been fabricated and that a prosecutor would have dropped charges had she known about the fabrication. *Id,* at 654-646. The same is true here. The Court drew inferences that were competing and negative to Plaintiff's claims. This is not permitted on a motion for summary judgment and the Court should also be reversed as to the proximate cause issue.[15]

## V.    CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests that this Court reverse the District Court's order and remand for further proceedings.

Edward M. Fox
Attorney for Plaintiff – Appellant
Attorney for Thomas Moorer
Ed Fox & Associates, Ltd.
300 W. Adams Street, Suite 330
Chicago, Illinois 60606
Phone: (312) 345-8877
Fax: (312) 853-3489
efox@efoxlaw.com

---

[15] The facts that are applicable to the ASA are also applicable to and the reason why the grand jury finding should not be deemed to be the proximate cause of the wrongdoing.

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2022, I electronically filed the foregoing Appellant Brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

Edward M. Fox
Attorney for Plaintiff – Appellant
Attorney for Thomas Moorer
Ed Fox & Associates, Ltd.
300 W. Adams Street, Suite 330
Chicago, Illinois 60606
Phone: (312) 345-8877
Fax: (312) 853-3489
efox@efoxlaw.com

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 32(a)

The undersigned, an attorney, certifies that the foregoing Appellant's Brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and 32(a)(7). The brief was prepared using Microsoft Word, 2010 version, and was written in 12-point font and contains 17,122 words.

Edward M. Fox
Attorney for Plaintiff – Appellant
Attorney for Thomas Moorer
Ed Fox & Associates, Ltd.
300 W. Adams Street, Suite 330
Chicago, Illinois 60606
Phone: (312) 345-8877
Fax: (312) 853-3489
efox@efoxlaw.com

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(D)**

The undersigned, an attorney, certifies that the Short Appendix bound with Appellant's Brief includes all of the documents required by Seventh Circuit Rule 30(a) and the documents required by Seventh Circuit Rule 30(b).

Edward M. Fox
Attorney for Plaintiff – Appellant
Attorney for Thomas Moorer
Ed Fox & Associates, Ltd.
300 W. Adams Street, Suite 330
Chicago, Illinois 60606
Phone: (312) 345-8877
Fax: (312) 853-3489
efox@efoxlaw.com

## TABLE OF CONTENTS TO RULE 30(a) APPENDIX

Memorandum Opinion & Order (December 20, 2021) (Dist. Ct. Dkt. No. 177)……..A1

Judgment in a Civil Case (December 20, 2021) (Dist. Ct. Dkt. No. 178)…………...A47

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

THOMAS MOORER,

        Plaintiff,

      v.

JOHN VALKNER, et al.,

        Defendants.

No. 18 CV 3796

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff Thomas Moorer spent almost seven years in pretrial detention, accused of murdering Edward Ramos. A jury found him not guilty. He alleges that officers of the Chicago Police Department didn't have probable cause to detain him for the murder. There are gaps in the record as to how Moorer became a suspect; police officers lost the victim's cellphone; other evidence suggested that Moorer didn't commit the crime; and CPD officers and the state's attorneys relied on photo array and in-person lineup identifications that Moorer alleges were unreliable. Moorer brings claims for unlawful pretrial detention, false imprisonment, and spoliation of evidence against CPD officers and the City of Chicago. Defendants move for summary judgment. For the reasons that follow, their motion is granted.

## I.    Legal Standards

Summary judgment is appropriate if the movants show that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists

if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). I construe all facts and draw all inferences in favor of Moorer, the nonmoving party. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 377–78 (7th Cir. 2020). I need only consider the cited materials, but I may consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II.   Facts

### A.   The Shooting

Someone murdered Edward Ramos. [164] ¶¶ 30–33.[1] Around midnight on August 27, 2010, Edward, his brother Edwin Ramos, and three of his cousins—Miguel Velez, Walter Velez, and Eliezer Martinez—were at their shared basement apartment on the northwest side of Chicago. *Id.* ¶¶ 8–10.[2] The five men were getting ready to go to a club with three friends: Jacklyn Hernandez, Alina Kindelan, and Delia Rivera. *Id.* ¶ 9. Hernandez, Kindelan, and Rivera pulled up at the apartment

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from Moorer's response to defendants' joint Local Rule 56.1 statement, [164], and defendants' response to Moorer's statement of additional facts, [174], where both the asserted fact and the opposing party's response are set forth in one document. Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I disregard legal arguments in the statements of facts, *see Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006), and ignore additional facts included in response to the asserted fact that do not controvert the asserted fact. N.D. Ill. Local R. 56.1(e)(2). Both parties rely heavily on compound facts—combining multiple allegations—in violation of Local Rule 56.1. *See, e.g.*, [164] ¶¶ 99–100; [174] ¶ 61. Plaintiff also fails to properly controvert many of defendants' statements of facts, which are therefore admitted. *See* [164] ¶¶ 13, 21, 55, 57, 68, 75–76, 85, 93–98, 106, 115.

[2] For ease of reading, I refer to Edward Ramos, Edwin Ramos, Miguel Velez, and Walter Velez by their first names.

around 11:30 p.m. or just before midnight. *Id.* ¶ 10. Walter came outside to speak with his girlfriend, Hernandez, who was still in the car. *Id.* ¶ 11. Rivera and Kindelan began walking towards the apartment. *Id.* ¶ 12.

A man with the lower part of his face covered and dressed in black clothing stepped out from the gangway to the building. [164] ¶ 13. He brandished a gun and confronted Kindelan and Rivera. *Id.* ¶¶ 13–14. The two women backed away and the man followed, coming into an area lit by streetlights. *See id.* ¶¶ 14–15. The parties dispute whether the man removed his mask at this point, but agree that he told Kindelan and Rivera to go away. *Id.* ¶ 15. The man then forced Walter to the apartment door. *Id.* ¶¶ 16–17. Rivera and Kindelan got back in the car with Hernandez. *Id.* ¶ 18. When they saw a second man emerge from the gangway, the women drove away and Hernandez called 911. *Id.*

The first man held a gun to Walter's head and told him to knock on the apartment door. [164] ¶ 19. Two other men were also in the gangway. *Id.* Walter banged on the door. *Id.* ¶ 20. Martinez and Edward, inside the apartment's living room, looked through the peep hole and then Edward opened the door. *See id.* ¶¶ 21, 24. The masked man rushed into the apartment and began shooting. *Id.* ¶ 22. There was a struggle for the gun, and Edward and Martinez fell to the ground. *Id.* ¶¶ 22–23. The man, whose face was now uncovered, fired several shots while standing, hitting Martinez in the leg. *Id.* ¶ 23. Miguel had been ironing clothes in a bedroom. *Id.* ¶ 24. After he heard the shots, Miguel looked into the living room, saw Edward struggling with the man, and ran out the back door. *Id.* Edwin heard the struggle,

saw a man on top of Edward and Martinez, and ran to assist. *Id.* ¶¶ 25–26. The man
hit Edwin in the head with the gun, but Edwin punched the assailant, causing the
man to drop the weapon. *Id.*

Disarmed, the man ran out of the apartment the way he'd come. [164] ¶ 28.
Edwin followed, but outside he saw a second man pointing a gun at him. *Id.* ¶ 29. The
first man told his accomplice to start shooting. *Id.* Edwin lunged backwards into the
doorway while Edward came past him, into the line of fire. *Id.* ¶ 30. Edward was shot
in the chest. *See id.* ¶ 32. The man and his two accomplices fled. *Id.* ¶ 31. Edwin,
Martinez, Miguel, and Walter carried Edward to a car, and Edwin drove his brother
and Martinez to a hospital. *Id.* ¶¶ 32–33. Edward died later that night. *Id.* ¶ 33.

## B.   Initial Investigation and Photo Array

Officers of the Chicago Police Department arrived at the scene minutes after
the shooting. [164] ¶ 34. Detectives Timothy McDermott, Matthew Benigno, and
Steven Becker were assigned to the case. *Id.* ¶¶ 3, 37. They canvassed the area while
forensic investigators gathered physical evidence. *Id.* ¶¶ 37–47. At a police station,
other CPD officers—detectives Brian Tedeschi, John Valkner, Emiliano Leal,

Nicholas Spanos,[3] and Tracy Fanning[4]—began interviews with Edwin, Miguel, Walter, Hernandez, Kindelan, and Rivera. *Id.* ¶¶ 3, 48. The witnesses were separated and their interviews were conducted individually. *Id.* ¶ 49.[5]

In general,[6] the six witnesses described the initial shooter as a Black man wearing jeans, a mask of some sort on the lower half of his face, between twenty-five

---

[3] To show individual liability under § 1983, Moorer must allege that each of the individual defendants was personally involved in the constitutional deprivation. *See Johnson v. Rimmer*, 936 F.3d 695, 710–11 (7th Cir. 2019) (citing *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017)). Personal involvement means (1) participating directly in the alleged violation; (2) knowing about the conduct; (3) facilitating the conduct; (4) approving the conduct, condoning it, or turning a blind eye to it. *Rasho v. Elyea*, 856 F.3d 469, 478 (7th Cir. 2017) (citations omitted). Moorer concedes that defendants Benigno's, Becker's, and Spanos's involvement in any alleged wrongdoing was minimal and that they should be dismissed from the case. [163] at 49. Based on that concession, and the failure to present evidence from which a jury could reach a verdict in Moorer's favor on any of his claims against Benigno, Becker, and Spanos, those defendants are entitled to judgment as a matter of law.

[4] Moorer argues that Fanning was personally involved in the violation of his rights because Fanning interviewed a witness who had difficulty seeing the crime and minimally described the offender, but Fanning didn't question the witness's reliability. *See* [163] at 48. But just because the witness was inconsistent or unreliable doesn't mean Fanning was required to discredit her statements. *See Woods v. City of Chicago*, 234 F.3d 979, 997 (7th Cir. 2000). The facts show that Fanning was minimally involved in the investigation and wasn't personally involved in the alleged wrongdoing. Summary judgment is granted to Fanning.

[5] Plaintiff denies that the witnesses were separated at the police station, [164] ¶ 49, but the portion of trial testimony Moorer cites in response to this fact does not support the proposition that the witnesses spoke with one another at the police station before their initial interviews with detectives. *See* [154-3] at 207–08. Defendants' statement of fact isn't fully supported because deposition testimony from Hernandez, Kindelan, and Miguel indicates only that their interviews were conducted separately, not that they didn't discuss their interviews after they took place. *See* [154-24] at 36–37, 70–71; [154-25] at 34–35; [154-26] at 42. The fact is otherwise admitted.

[6] Martinez gave a statement at the hospital at 1:10 a.m., and described the initial shooter as being a dark-skinned Black man with the lower portion of his face covered, twenty-four to twenty-six years old, five foot ten inches to five foot eleven inches tall, and 180-190 pounds. [174] ¶¶ 3–4. Edwin spoke to detective Valkner at 1:30 a.m., and said that the first shooter was a Black man in his thirties, six foot to six foot three inches tall, about 250 pounds, and wore a dark shirt, blue jeans, tan boots, and that the lower portion of his face was covered by a mask, bandana, or shirt that came off during the struggle. *Id.* ¶ 7. Hernandez gave a statement to detective Tedeschi at the station at 1:30 a.m. *Id.* ¶ 13. She described the first

and thirty-six years old, five foot ten to six foot three inches tall, and weighing between 180 and 250 pounds. *See* [174] ¶¶ 3–4, 7, 13, 16, 19, 21, 23; [164] ¶ 50.[7] With the exception of Kindelan's interview with detective Leal, which wasn't similarly documented, the detectives summarized the witnesses' interviews in general progress reports. [164] ¶¶ 51–52.

At 1:30 in the morning on August 28, detective Valkner interviewed Edwin. [174] ¶ 7. Edwin said that he recognized the man who entered the apartment. [164] ¶ 53; [174] ¶¶ 7–8, 24. He said that his brother had sold drugs to the man, who went by the nickname, "Boom," and that a dispute had arisen over an unpaid debt. *See* [164] ¶ 53; [174] ¶¶ 8, 24. Edwin said that he had seen Boom on two earlier occasions, and that Boom made threatening phone calls to his brother during the week before

shooter as a Black man wearing black clothing. *Id.* Walter spoke with detective Valkner at 2:00 a.m., and described the first shooter as a Black man, thirty-five to thirty-six years old, with a medium dark complexion, wearing a black shirt, jeans, and a mask on the lower half of his face. [174] ¶ 16. Rivera was interviewed by detective Fanning at 2:00 a.m., and, while indicating that she didn't seem him very well, described the first shooter as a dark-skinned Black man, twenty-five years old, fat, with short dreadlocks, a white t-shirt, dark pants, and a mask on his face. *Id.* ¶ 19. Kindelan gave a statement at 2:10 a.m. to detectives Leal and Spanos, describing the assailant as a Black man, twenty-five to thirty-five years old, six foot tall, 250 pounds, wearing a black shirt over his face. *Id.* ¶ 21. Miguel spoke to detective Tedeschi at 2:10 a.m., and described the first shooter as a Black man, five foot eleven inches to six foot tall, and approximately 230 pounds. *Id.* ¶ 23.

[7] Plaintiff's statements of fact describe numerous inconsistencies between the eyewitnesses' initial and subsequent descriptions of the shooter. *See* [174] ¶¶ 5, 13–23. Two subsequent statements that Martinez gave differed from his initial statement to police officers. *Id.* ¶ 5. In one, Martinez said he was able to see the offender's face because the mask had come off. *Id.* In a videotaped interview and later at trial, Hernandez said that she told the police that the shooter was "big." *Id.* ¶ 14. In a deposition, Hernandez said that she told officers she had never seen the man's unmasked face, which contradicted her trial testimony. *Id.* ¶ 15. Rivera testified at trial that she told detectives that the shooter was tall, Black, and big. *Id.* ¶ 20. In Kindelan's videotaped statement, she described the shooter as dark, huge, big, and tall and said that she did not see the man with a gun. *Id.* ¶ 22. Because this case is about whether the officers had probable cause, I consider only the evidence that bears on what the officers knew at the time they initiated Moorer's detention.

the shooting. [164] ¶ 54; [174] ¶ 8. Edwin told detectives that they could find Boom's contact information in Edward's cell phone. [164] ¶ 54; *see* [174] ¶ 9.

A cell phone was recovered at the scene of the crime. [164] ¶ 42. A forensic investigator collected and transported physical evidence to his office, *id.* ¶ 46, but detective McDermott requested that the investigator turn over the cell phone to him rather than inventory it. *Id.* ¶ 47; [174] ¶ 66. The investigator gave the phone to McDermott. [164] ¶ 47; [174] ¶ 66. Having finished his work at the scene, McDermott returned to the police headquarters at around 4:20 a.m. [164] ¶ 69. While McDermott said that he or someone else should have documented and inventoried the phone, it was never inventoried, and the record is silent as to what became of it after the investigator gave the phone to McDermott. [174] ¶ 67; [164] ¶ 71.

But police reports show that Edwin identified a cell phone as belonging to his brother, and that Edwin and Valkner searched the contacts of the phone and located an entry for "Boom" associated with the number (773) 754-2075. [174] ¶ 9; [164] ¶ 70. Later, however, Edwin said that he assumed his brother's phone had been password-protected, couldn't remember going through the contacts in Edward's phone with detectives, and didn't know what happened to Edward's cellphones after the "incident." [174] ¶ 10. Valkner couldn't remember looking at a phone with Edwin or who had given him the phone. [174] ¶¶ 11, 68.[8]

---

[8] Moorer's allegations turn both on how Moorer became a suspect and on the missing cellphone. He claims that Edwin was coerced into identifying Moorer's photograph, and that the officers, knowing that Moorer wasn't involved in the murder, destroyed Edward's cellphone. *See* [163]. Since Valkner conducted the pivotal interview with Edwin and may have searched the missing cellphone, a jury could find that Valkner personally participated in the alleged violations.

A CPD officer ran a nickname search for "Boom" in a database. [164] ¶ 55; *see* [174] ¶ 24.[9] Detective Gonzalez said that the database search turned up a photograph of Thomas Moorer which was then put into a photo array, *see* [174] ¶ 24; [164] ¶¶ 55–56; [165-15] at 10, but couldn't remember which detective ran the search, how many results the search returned, or how Moorer's photograph was chosen from among the results. [174] ¶ 25. Detectives McDermott, Cardo, and Valkner also couldn't remember which officer made the database search. *Id.* ¶ 28. When Moorer's public defenders made a search for Boom in the same database six years later, they turned up nearly 200 results, including Moorer. *Id.* ¶ 26; *see* [165-16] at 3.

Detectives gave Edwin two books or "a bunch of papers" that included the photographs of six people on each page. *See* [164] ¶ 56; [174] ¶ 31.[10] Moorer's photograph was included. *See* [164] ¶ 56. When that picture was taken, Moorer weighed between 235 and 245 pounds, which was significantly more than the 180 pounds that he weighed in August 2010. *See* [174] ¶ 1; [165-44] at 2. After looking at the photographs for twenty to thirty minutes, Edwin identified Moorer as having been involved in the shooting. *See* [164] ¶ 56.[11] Detectives then stepped out of the room

---

[9] The testimony cited by both parties supports the fact that a CPD officer searched the police database for the name Boom, but does not mention how many results were generated by the search. *See* [154-7] at 35–36; [154-17] at 72–76; [154-18] at 15–16; [165-15] at 11. Plaintiff does not properly controvert the fact that the nickname search was performed by a CPD officer. *See* [164] ¶ 55. That detectives did not recall personally searching the system and couldn't remember which particular officer had made the search does not controvert the fact that the search was performed by a CPD officer. The fact is admitted.

[10] The parties dispute the precise form of the initial mugshot printouts that Edwin viewed, but that dispute is immaterial.

[11] Moorer alleges that it's not known how he came to be a suspect in the first place, *see* [174] ¶¶ 28, 93, but the record doesn't fully support that allegation. After Edwin gave CPD the

and returned with a printout including Moorer's image. *See* [174] ¶ 32. The detectives asked Edwin to confirm his identification, and had him circle the picture of Moorer and sign his name under the image. *See* [174] ¶ 32.

An unknown CPD officer created a photo array of six photographs, including Moorer's. *See* [164] ¶¶ 58–59; [154-36]; [154-37]. Detective Tedeschi logged into the CPD's mug shot database, used to create photo arrays, and performed his first command at 1:30 a.m. [164] ¶ 57. The computer system could create photo arrays in several ways: based on a suspect's mugshot, demographic information, or by inputting a specific name or identifying number. [174] ¶¶ 34–35. It generally took ten to twenty minutes to put together a photo array. *Id.* ¶ 42. Once created, a photo array could be saved, but if it was not, there was no way to tell whether the system generated a photo array. *Id.* ¶ 35. Tedeschi said that he didn't believe he had made the array in this case. *Id.* ¶ 42. No one saved the photo array including Moorer in the system, *see id.* ¶ 36, but paper copies of the array were preserved. *See id.*; [164] ¶ 58; [154-36]; [154-37].

In the photo array, Moorer's photograph appears in the middle position of the bottom row, and the fillers appear to be the same race and sex as Moorer. [164] ¶ 59;

name Boom, a CPD officer ran a search in a database, someone produced photographs associated with that search, and from those photographs Edwin identified Moorer as a person involved in the shooting. *See* [164] ¶¶ 55–56; [174] ¶ 24; [165-15] at 10–11. That the computer search and resulting printouts that Edwin saw weren't saved, and that it's not clear which officer performed the search, does not mean that it's unknown how Moorer came to be a suspect.

*see* [154-36].[12] Moorer was not moved from that position in any photo array. [174]

¶ 88. Hernandez, Edwin, Kindelan, Rivera, and Miguel viewed the photo array that

included Moorer's photograph: Hernandez viewed the array at 1:35 a.m.; Edwin at

2:00; Kindelan at 2:30; Rivera at 2:37; and Miguel at 3:30. [164] ¶ 67. Before seeing

the array, each witness separately signed an advisory form, which said that a suspect

wouldn't necessarily be in the spread and that the witness wasn't required to make

an identification. *Id.* ¶¶ 61–63. At no time were the witnesses told who to identify, or

where Moorer was in the array. *Id.* ¶ 65.[13] Hernandez later said that officers told her

to "pick out who I seen." [164] ¶ 64. All five witnesses positively identified Moorer as

being involved in the home invasion. *Id.* ¶ 68.[14] Hernandez, Edwin, and Miguel

confirmed with detective Tedeschi that they were 100 percent certain in their

identifications. *Id.* After Kindelan identified Moorer, detective Leal circled Moorer's

---

[12] Plaintiff disputes whether the fillers were the same weight as Moorer, and whether they shared the same hair style. [164] ¶ 59. I discuss the array in more detail below.

[13] As noted above, after Edwin initially identified Moorer's photograph, he was asked to confirm his identification on a separate print out. *See* [174] ¶ 32. It's not clear whether Edwin also viewed a separate photo array or if the separate print out was the photo array itself.

[14] Plaintiff doesn't properly controvert defendants' compound fact that Hernandez, Edwin, Miguel, Rivera, and Kindelan identified Moorer as being involved in the crime, and so that fact is undisputed and admitted. *See* [164] ¶ 68. Moorer's response includes numerous additional facts that speak to the unreliability and inconsistency of the witnesses' identifications, but a response to an asserted fact may not set forth new facts that aren't fairly responsive to the asserted fact. N.D. Ill. Local R. 56.1(e)(2). That the witnesses' identifications were inconsistent with their earlier or subsequent statements does not controvert the fact that the witnesses made the identifications, and so I ignore Moorer's additional, unresponsive facts about what the witnesses said they could see or had seen on the night of the murder.

photograph on Kindelan's copy of the array in order to verify Kindelan's identification. *See* [164] ¶ 66; [154-15] at 32–33.[15]

After returning to the station at 4:20 a.m., detective McDermott called Assistant State's Attorney Maria Augustus. [164] ¶¶ 69, 72. Augustus came to the station where she was briefed on the investigation, reviewed police reports, and reinterviewed witnesses with McDermott. *Id*. ¶ 73. After the interviews, at 7:50 a.m., McDermott and Augustus mutually agreed to issue an investigative alert with probable cause to arrest Thomas Moorer. *Id*. ¶¶ 75–76; [174] ¶ 43. McDermott didn't pressure Augustus to issue the alert or recommend charges. [164] ¶ 76.

## C.    Moorer's Arrest and the In-Person Lineups

McDermott's shift ended, and detectives Cardo and Gonzalez took over the investigation. [164] ¶ 77. The detectives went to Moorer's last known address and set up surveillance. *Id*. ¶ 79. At about 3:25 p.m. on August 28, Moorer left his house and got into a car. *Id*. ¶ 80; [174] ¶ 45. Police officers stopped the vehicle, and Moorer was taken into custody and brought to the police station. [164] ¶ 80; [174] ¶ 45. Moorer agreed to speak with detectives. [164] ¶ 81; [174] ¶¶ 53, 55. He denied being involved in the crime and said that he had been home the day of the shooting with his sisters and his sisters' children. [164] ¶ 82; [174] ¶¶ 53, 55.

---

[15] Plaintiff argues that Leal was personally involved in the violation of his Fourth Amendment rights because Leal circled Moorer's picture in the photo array after Kindelan identified Moorer. [163] at 48. But it's not reasonable to infer from the fact that Leal circled Moorer's picture *after* Kindelan identified Moorer that Leal coached the witness into making an identification, and the undisputed facts show that Leal was minimally involved in the investigation and wasn't personally involved in the alleged constitutional deprivation. *See Johnson v. Rimmer*, 936 F.3d 695, 710–11 (7th Cir. 2019). Leal is entitled to summary judgment on Moorer's § 1983 claim.

Cardo and Gonzalez learned that Moorer's nickname was "Boomer," rather than Boom. [174] ¶ 48. The detectives didn't see any injuries on Moorer's body or blood on his clothing or his person, *see id.* ¶ 52, officers tracked the phone associated with Boom at locations that were different from where Moorer's vehicle and home were, *id.* ¶¶ 44, 46, and Moorer's car didn't match the description of the vehicle seen leaving the crime scene. *Id.* ¶ 54. Moorer didn't own a cell phone, didn't have one in his possession when he was arrested, and police officers never found a connection between Moorer and the number for Boom. *Id.* ¶ 47. Officers never secured a search warrant or asked to search Moorer's home. *Id.* ¶ 95.

Cardo and Gonzalez called Edwin, Miguel, Walter, Kindelan, Hernandez, and Rivera, and asked them to return to the station to view an in-person lineup. [164] ¶ 83. Some of the witnesses sat together at the police station before viewing the in-person lineup. *See* [174] ¶ 89. Cardo and Gonzalez assembled the lineup, including Moorer and four other individuals selected from lockups in the area. [164] ¶¶ 84–85; *see* [154-38]. Moorer was the only person in the photo array and the live lineup, and was not placed in different positions during the lineup. [174] ¶ 88. All of the lineup participants appeared to be Black men. [164] ¶ 85.[16] The lineup participants wore civilian clothes, and Moorer wore clothing different from that which the shooter was wearing at the time of the home invasion. *Id.* ¶ 86. Before viewing the lineup,

---

[16] The testimony defendants cite does not show that the lineup participants had approximately the same height, weight, and age. The testimony is that the detectives attempted to secure a lineup with those characteristics. *See* [164] ¶ 85; *see* [154-17] at 94; [154-18] at 69.

Gonzalez met separately with each witness and asked them to read and sign an advisory form. *Id.* ¶ 87. The witnesses read and signed the forms, *id.* ¶ 88, and then viewed the lineup independently of one another and waited in separate rooms until all of the witnesses had finished viewing the lineup. *Id.* ¶¶ 89–90.

Walter viewed the lineup first, identified Moorer, but was only eighty percent certain. [164] ¶ 92. Detective Gonzalez treated his lack of confidence as a negative identification. *Id.* Rivera went next and identified Moorer as the person she had seen with a gun. *Id.* ¶ 93. Edwin identified Moorer right away. *Id.* ¶ 94. Edwin also thought that another man present at the attack was in the lineup, but detectives told him to ignore that other man and focus only on the man who entered the apartment. *Id.*; [154-22] at 41. Hernandez and Kindelan identified Moorer as the person they had seen in the gangway. [164] ¶¶ 95–96. Miguel viewed the lineup later on the evening of August 28th, and positively identified Moorer as the man whom he seen wrestling with Edward. *Id.* ¶ 97.[17] According to Gonzalez, with the exception of Walter, none of the other witnesses expressed any doubt in their identifications of Moorer. *Id.* ¶ 98.

---

[17] In response to the in-person lineup identifications by Rivera, Hernandez, Kindelan, and Miguel, plaintiff offers additional facts about the reliability and consistency of their identifications, but those facts don't controvert the identifications themselves. *See* [164] ¶¶ 93–97. Moorer notes that Rivera described the shooter as having dreadlocks, even though Moorer didn't at the time she viewed the lineup. *Id.* ¶ 93. Hernandez said that she had never seen the lower part of the shooter's face but still identified Moorer. *Id.* ¶ 95. Kindelan said she didn't see anyone holding a gun, but identified Moorer as having held one during the crime. *Id.* ¶ 96. Miguel said that he hadn't seen the shooting but identified Moorer as having shot a gun. *Id.* ¶ 97. Miguel also said when detectives called him into the station to view the lineup, they told Miguel that a suspect was in custody, and they had arrested the person he had identified from the photo array. *Id.* ¶ 88 These facts don't respond to the identifications themselves: they cast doubt on the reliability and consistency of the witnesses' perception, but do not controvert the facts that the identifications were made. *See* N.D. Ill. Local R. 56.1(e)(2). There is no dispute that the witnesses selected Moorer. The facts are admitted.

Assistant State's Attorney Augustus reinterviewed Edwin, Miguel, Walter, Hernandez, Kindelan, and Rivera. [164] ¶ 99. The six witnesses gave videotaped statements of their accounts of what happened during the home invasion. *Id*. The witnesses confirmed that they had read and understood the lineup advisory forms and that they had positively identified Moorer in the photo array, physical lineup, or both. *Id*. ¶ 100.[18] The witnesses said that officers had not threatened them or made promises, and that they gave their statements freely and voluntarily. *Id*. ¶ 101.

On August 29, Martinez was released from the hospital and came to the police station to view a physical lineup. [164] ¶ 102. He had not viewed the photo array. *See* [164] ¶¶ 67–68, 102; [174] ¶ 88. Detectives Cardo and Gonzalez assembled another physical lineup, including Moorer and four "fillers." *Id*. ¶ 103. Moorer was placed in a different position in this lineup than he had been in the previous one. [174] ¶ 88. The parties agree that all of the subjects in the lineup appeared to be Black men of approximately Moorer's age, but dispute whether they were the same approximate height and weight. [164] ¶ 104. Martinez read and signed the advisory form before viewing the lineup. *Id*. ¶ 105. Martinez viewed the lineup and identified Moorer as the person who struggled with Edward and subsequently shot and killed him. *Id*. ¶ 106.[19]

---

[18] The records cited by defendants in this compound fact do not support the idea that the witnesses' statements were consistent with their earlier statements, since defendants only cite one statement by each witness. *See* [164] ¶ 100. Moorer's response doesn't controvert the fact that the witnesses read and signed the advisory forms and confirmed their identifications, and so that fact is admitted.

[19] Moorer disputes that Martinez viewed the lineup and identified Moorer, but plaintiff's response doesn't controvert the asserted fact. *See* [164] ¶ 106. That Martinez said Moorer had

That night, detectives investigated Moorer's claim that he had been home during the time of the shooting. [164] ¶ 107; [174] ¶ 57. In his initial interview with detectives, Moorer told Gonzalez to call a woman who would confirm his whereabouts, and it's reasonable to infer that Moorer meant police officers should speak to his girlfriend. *See* [174] ¶ 56.[20] Detectives McDermott and Folino went to Moorer's residence. [174] ¶ 57; [164] ¶ 107. Moorer's girlfriend, Lakisha Shorter, answered the door, but the detectives didn't interview her. [174] ¶ 57. In depositions taken later, Shorter and Tierra Moorer said that Moorer was with them at the party at the time of the murder. [174] ¶ 62.

At Moorer's home, McDermott and Folino spoke to Vaneglen Moorer and Jeanetta Nobles. [174] ¶ 58; [164] ¶¶ 107–110.[21] Vaneglen said that she was with Moorer on the day of the shooting, and that he attended a party that was on the first floor of their home. *See* [164] ¶ 108; [174] ¶ 58. But Vaneglen said that she had periodically left the party to be with her sleeping children, and that there were times that night when she didn't see Moorer. [164] ¶ 109; [174] ¶ 58. Nobles said that she was upstairs but heard several people playing music downstairs. [164] ¶ 110. Nobles

---

an injury to one his arms that wasn't in the photographs of Moorer at the time of his arrest doesn't controvert the identification itself. The fact is admitted.

[20] The cited portions of Moorer's interview with detectives don't show that Moorer told officers to speak to his girlfriend, merely to an unnamed woman who would confirm his whereabouts on the night of the shooting. *See* [154-33] at 36. But Moorer referred to his girlfriend earlier in his interview, *see id.* at 34, and it's reasonable to infer that Moorer wanted police officers to speak to her to confirm his alibi.

[21] For ease of reading I refer to Vaneglen Moorer by her first name and plaintiff Thomas Moorer by his last.

was asleep from 10 p.m. on August 27 to 2 a.m. on August 28, and didn't see Moorer during that period. *Id.* ¶ 110.[22]

At some point after their interviews at Moorer's residence, Vaneglen and Nobles were taken to the police station. [164] ¶ 111; *see* [174] ¶ 60. The parties dispute whether Vaneglen had a choice to go to the police station or not. *See* [174] ¶ 61; [164] ¶ 113.[23] Vaneglen and Nobles spoke to ASA Augustus, and detective Frank Szwedo was also present. [164] ¶ 111; *see* [174] ¶ 60. Early in the morning on August 30, Vaneglen and Nobles signed written statements at the station. [164] ¶ 112; [174] ¶ 60. Their statements largely agreed with what they told detectives the day before. *See* [164] ¶ 112; [174] ¶ 61; [165-40] at 3. Vaneglen and Nobles were not promised anything in exchange for cooperating with the investigation. [164] ¶ 113.[24]

---

[22] Plaintiff argues that detective Folino was personally involved in the deprivation of his rights because Folino was present at the interviews of Vaneglen and Nobles but didn't speak to other witnesses about Moorer's whereabouts at the time of the shooting. *See* [163] at 48. But while an officer can't ignore conclusive evidence of an alibi, the Fourth Amendment doesn't require officers to investigate the validity of an affirmative defense. *See Dollard v. Whisenand*, 946 F.3d 342, 355 (7th Cir. 2019). Here, there wasn't conclusive evidence of Moorer's alibi: defendants weren't required to take Moorer's word for it, and Folino had no duty to talk to every person in Moorer's house in order to verify plaintiff's whereabouts. The facts show that Folino's involvement in the investigation was minimal, and Moorer hasn't shown that Folino was personally involved in the deprivation of his constitutional rights. *See Johnson v. Rimmer*, 936 F.3d 695, 710–11 (7th Cir. 2019). Folino is entitled to summary judgment on the § 1983 claim.

[23] The record cited by plaintiff doesn't support the allegation that Vaneglen was told she had to go to the police station, but Vaneglen did testify to that effect elsewhere. *See* [165-46] at 119.

[24] Moorer argues that Szwedo was personally involved in the violation of his rights because Szwedo was present when Vaneglen and Nobles were interviewed at the station and knew of other alibi witnesses but failed to interview them. *See* [163] at 48. But Szwedo's failure to interview alibi witnesses didn't violate Moorer's rights, *see Jackson v. City of Peoria, Illinois*, 825 F.3d 328, 330 (7th Cir. 2016) (citations omitted), and his involvement in the case began and ended with the interviews of Vaneglen and Nobles. Szwedo wasn't personally involved

### D.      The Grand Jury, Pretrial Detention, and Acquittal

At 12:15 a.m. on August 30, Augustus approved three felony charges against Moorer: first degree murder, attempted murder, and aggravated battery with a firearm. [164] ¶ 114; [174] ¶ 59. McDermott, Gonzalez, and Cardo said that they didn't pressure or lie to Augustus in order to coerce her into approving the charges. [164] ¶ 115.

In September 2010, a grand jury heard testimony from Vaneglen and Nobles, along with Edwin, Miguel, Rivera, Kindelan, and Hernandez. *Id*. ¶¶ 116–19. The state introduced the advisory forms and photo arrays documenting the witness identifications of Moorer. *Id*. ¶ 119. The grand jury returned a 135-count indictment charging Moorer with first-degree murder, among other crimes. *Id*. ¶ 120.

As part of its pretrial preparations, the state conducted testing on the physical evidence from the crime and studied the phone records of the number associated with Boom. [164] ¶¶ 121–22. Investigators compared Moorer's DNA to samples found at the crime scene. *Id*. ¶ 121; [174] ¶ 65. A brown hat found at the scene had DNA from two profiles, but neither matched Moorer. [174] ¶ 65. Similarly, Moorer was excluded as a match for DNA found on two pieces of black cloth, a portion of a collar, and a t-shirt. *Id*. The state subpoenaed phone records for the number associated with Boom and hired an expert to analyze cell tower information to determine the phone's location at the time of the shooting. [164] ¶ 122. The expert was unable to determine

in the alleged violation of Moorer's rights, and so he is entitled to summary judgment on the § 1983 claim.

where the phone had been located during the shooting because it had been turned off. *Id*. ¶ 123. The expert was able to determine that the records were inconsistent with the phone being used near Moorer's home on August 27 or 28, 2010. *Id*. The phone number associated with Boom continued to be used after Moorer was arrested. *See* [174] ¶ 12. One of the prosecutors in Moorer's trial later said that the cell phone could have contained exculpatory evidence. *Id*. ¶ 92.

Four years after Moorer's arrest, the city fired detective McDermott because he appeared with another CPD officer in a photograph with an African American man, posing as if McDermott were a hunter and the man was his prey. [174] ¶ 105.[25] The Police Board determined that McDermott impeded CPD's efforts to achieve its policy and goals, discredited the department, and disrespected the unidentified African American man in the photograph. *Id*.

Moorer's criminal trial was held in July 2017, almost seven years after his pretrial detention started. [164] ¶ 127. Edwin, Martinez, Miguel, Hernandez, Rivera, and Kindelan testified for the prosecution and reaffirmed their identifications of Moorer as one of the shooters. *Id*. ¶ 128. A professor of psychology testified for the

---

[25] The circumstances of McDermott's termination may bear on his character for truthfulness because they suggest a potential bias. *See* Fed. R. Evid. 608. That said, this fact can't help Moorer at this stage of the case because credibility is not assessed at summary judgment, and none of the undisputed facts depend on McDermott's credibility. *See Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019) (citing *Palmer v. Franz*, 928 F.3d 560, 565 (7th Cir. 2019)). Plaintiff also offers facts about two other lawsuits involving McDermott and detective Folino, *see* [174] ¶¶ 103–104, but those allegations are inadmissible character evidence because they are relevant only insofar as they make it more likely that the officers acted similarly in this case. *See* Fed. R. Evid. 404(b); *United States v. Gomez*, 763 F.3d 845, 855 (7th Cir. 2014).

defense that the photo array and live lineups including Moorer weren't reliable. *Id.* ¶¶ 130–31.[26]

The jury found Moorer not guilty on all counts. [164] ¶ 134. Ten months later, Moorer filed this lawsuit. [1].

## III.    Analysis

### A.    Fourth Amendment: Unlawful Detention

The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV. A seizure, including pretrial detention, is reasonable only if it was based on probable cause to believe the detainee had committed a crime. *See Lewis v. City of Chicago*, 914 F.3d 472, 476 (7th Cir. 2019) (citation omitted). The Fourth Amendment governs both detentions that happen before legal process and pretrial detentions that occur after legal process. *See Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 919 (2017); *see also Kuri v. City of Chicago*, 990 F.3d 573, 575 (7th Cir. 2021).

---

[26] Moorer alleges a series of facts drawn from a report prepared by this same expert, *see* [174] ¶¶ 70–80; from a report by a second witness, a lawyer and retired police officer, *see id.* ¶¶ 81–96; and from deposition testimony of a third expert, another professor of psychology. *See id.* ¶¶ 97–102. These experts cast doubt on the reliability of the identifications in the case, note the non-identification evidence that pointed away from Moorer, opine that the missing cell phone was possibly exculpatory, and conclude that defendants didn't follow proper procedures in various ways. *See* [174] ¶¶ 70–102. The experts' opinions are more than a "bottom line," *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) (quoting *Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989)), and are at least minimally relevant here because they address flaws in the investigation that could undermine defendants' probable cause to detain Moorer. *See Williamson v. Curran*, 714 F.3d 432, 444 (7th Cir. 2013). However, that expert witnesses found the identifications in this case to be unreliable or suggestive is not conclusive because whether probable cause existed based on the undisputed facts at summary judgment is a question of law. *See United States v. Ellis*, 499 F.3d 686, 688 (7th Cir. 2007) (quoting *Smith v. Lamz*, 321 F.3d 680, 684 (7th Cir. 2003)).

Unlawful pretrial detention occurs when either "the police hold someone without any reason before the formal onset of a criminal proceeding," or when "legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements." *Manuel*, 137 S. Ct. at 918.

Probable cause is an absolute bar to a claim for unlawful detention. *See Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (quoting *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006)). Probable cause exists if the facts and circumstances within the arresting officer's knowledge would allow a prudent person to believe that the suspect had committed or was committing an offense. *Camm v. Faith*, 937 F.3d 1096, 1105 (7th Cir. 2019) (quoting *Gower v. Vercler*, 377 F.3d 661, 668 (7th Cir. 2004)). Probable cause is assessed objectively, based on the conclusions that the arresting officer reasonably might have drawn from information known to him. *Young v. City of Chicago*, 987 F.3d 641, 644 (7th Cir. 2021) (citations omitted).

A grand jury indicted Moorer, [164] ¶ 120, and that's prima facie evidence of probable cause. *Coleman v. City of Peoria, Illinois,* 925 F.3d 336, 351 (7th Cir. 2019) (citing *Wade v. Collier*, 783 F.3d 1081, 1085 (7th Cir. 2015)). The presumption of probable cause after a grand jury has indicted a defendant can be rebutted by "evidence that law enforcement obtained the indictment through improper or fraudulent means." *Id*. (citations omitted). In other words, Moorer must show that defendants knew that there was no probable cause to seize him or intentionally or recklessly provided false information to the grand jury. *See id.* (citing *Williamson v. Curran*, 714 F.3d 432, 444 (7th Cir. 2013)); *Olson v. Champaign County, Ill.*, 784 F.3d

1093, 1100 (7th Cir. 2015) (citations omitted) (officers act unreasonably if they intentionally or recklessly provide false information).

A single identification from a credible eyewitness is sufficient for probable cause. *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015) (citing *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000)); *Phillips v. Allen*, 668 F.3d 912, 915 (7th Cir. 2012) (citations omitted) ("Identification by a single eyewitness who lacks an apparent grudge against the accused person supplies probable cause for arrest."). But to establish probable cause, police officers can't rely on identifications that are the product of "coercion or manipulation." *Hart*, 798 F.3d at 587 (citing *Phillips*, 688 F.3d at 917). Moorer wants the eyewitness identifications in his case to be assessed using the two-step process used in the Due Process context, *see* [163] at 36, but that is not the test for probable cause under the Fourth Amendment. *See Phillips*, 688 F.3d at 915; *Coleman v. City of Peoria, Illinois,* 925 F.3d 336, 347–48 (7th Cir. 2019). Instead, to show that officers lacked probable cause to detain him on the basis of a coerced or manipulated identification, Moorer must show that defendants used a forbidden technique "to trick a person into making an unreliable identification." *Phillips*, 688 F.3d at 917. Or, Moorer must show that a jury could infer that the officers did not believe that the identifications were truthful. *See Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 377–78 (7th Cir. 2020).

Moorer argues that the identifications in his case were unreliable, overly suggestive, and that—because of gaps in the record about how he became a suspect, missing evidence, unfollowed leads, and evidence that pointed away from him—

defendants knew that the eyewitnesses were mistaken or lying when they identified

him as being involved in the murder. *See* [163] at 36–45.[27] But the undisputed facts

don't support these arguments, and no jury could find that defendants coerced or

manipulated the witness identifications or otherwise had reason to know that Moorer

wasn't involved in the murder or that the identifications were false.

1. *The Police Officers Were Not Required to Discount the Witnesses'*
*Identifications*

By pointing out inconsistencies between the witnesses' identifications of

Moorer and their earlier and later statements to detectives, *see* [163] at 16–18, 26–

29, 40–41, Moorer challenges the eyewitnesses' credibility. *See Coleman v. City of*

*Peoria, Illinois*, 925 F.3d 336, 351 (7th Cir. 2019). It's true that some of the witnesses'

identifications don't line up with how they otherwise described the shooting and the

suspect. For instance, Moorer had facial hair at the time of his arrest, *see* [154-42],

but in their initial statements none of the witnesses described the first shooter as

having a mustache. *See* [174] ¶¶ 3–4, 13, 16, 19, 21, 23; [164] ¶ 50.[28] The

circumstances of the crime may also have made it hard for witnesses to see the

suspect clearly: it was dark, *see* [164] ¶¶ 13–15, and the suspect had a mask on for

---

[27] Defendants Fanning, Leal, Spanos, Becker, Folino, Benigno, and Szwedo were not personally involved in the alleged violation of Moorer's rights, and summary judgment is entered in their favor on that basis. *See* notes 3, 4, 15, 22, and 24 above. Defendants Valkner, Tedeschi, Gonzalez, Cardo, McDermott, and the City of Chicago remain at issue for the Fourth Amendment claim.

[28] Other inconsistencies include: (1) Rivera described the masked shooter as having dreadlocks, even though Moorer didn't at the time she viewed the lineup, [164] ¶ 93, and (2) Kindelan said she didn't see anyone holding a gun, but identified Moorer as having held one during the crime. *Id.* ¶ 96.

much of the encounter. *See id*. ¶¶ 13, 22.[29] But these inconsistencies and challenges to perception didn't make the witnesses so unreliable that the officers could not believe them. *See Hart v. Mannina*, 798 F.3d 578, 591 (7th Cir. 2015) ("In real-world investigations, police often confront the limits of human memory and facial recognition."); *Woods v. City of Chicago*, 234 F.3d 979, 997 (7th Cir. 2000) (facts that diminished the credibility of a criminal complaint weren't enough to render that report incredible as a matter of law); *Johnson v. Acevedo*, 572 F.3d 398, 405 (7th Cir. 2009) (citation omitted) (eyewitness failure to include facial hair in an initial description was minor discrepancy affecting credibility but not destroying validity of identification testimony). It's undisputed that the eyewitnesses were at the scene of the crime, saw a man committing crimes, and personally identified Moorer as that man. There's no evidence that the witnesses had a grudge against Moorer, and their accounts were not incredible as a matter of law. *See Coleman*, 925 F.3d at 351 (citing *Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016)).

> ### 2.    *There Is No Evidence that the Identifications Were Coerced or Manipulated*

Moorer offers a long list of reasons why both the in-person and photo array lineups in his case were overly suggestive or unreliable, and therefore not a suitable basis for probable cause. *See* [163] at 36–45.

---

[29] Moorer's expert witness noted that poor viewing conditions would have made it difficult for the eyewitnesses to see the suspect, the gun and stress would have distracted the witnesses from the appearance of the offender, the eyewitnesses' attention was divided among multiple offenders, the event took place in a short period of time, and cross-racial identification may have made accurate identification more difficult. [174] ¶¶ 72–76.

First, Moorer argues that the fillers in both the array and lineups didn't match the described weight of the offender. *See* [163] at 38. Some of the witnesses said the suspect was between 180-250 pounds, *see* [174] ¶¶ 3–4, 7, 21, 23, but not all of the witnesses estimated the masked man's weight. *See id*. ¶¶ 13, 16, 19. The demographics of the fillers in the in-person lineups weren't recorded, *see* [164] ¶ 85, but it's reasonable to infer that they were smaller than the 250-pound estimate given by some of the eyewitnesses. *See* [154-38]; [154-42]. The fillers in the photo array all weighed between 175-195 pounds, *see* [154-36], and were therefore lighter than the description given by three of the eyewitnesses, but fit the lower end of the description. *See* [174] ¶¶ 3, 7, 21, 23.

An examination of the photographs and the demographics of the photo array fillers shows lineups of men reasonably similar in weight to the suspect witnesses described. *See* [154-36]; [154-38]; [154-42]. In other words, the discrepancies in size between the fillers in both the array and in-person lineups and the description given by some of the eyewitnesses wasn't so great as to make the array and lineups overly suggestive. *See United States v. Curry*, 187 F.3d 762, 769 (7th Cir. 1999) (quoting *United States v. Funches*, 84 F.3d 249, 253 (7th Cir. 1996)) (participants in a lineup must have "descriptive features within a reasonable range of similarity to each other").[30] Similarly, the deviation from the eyewitness descriptions does not support

---

[30] Police best practices suggest that defendants should have selected fillers who "generally fit the witness[es'] description of the perpetrator," but that "when the description of the perpetrator differs significantly from the appearance of the suspect, fillers should resemble the suspect in significant features." U.S. Department of Justice, Technical Working Group for Eyewitness Evidence, *Eyewitness Evidence: A Guide for Law Enforcement* 29 (October 1999).

an inference that the officers chose the fillers in an intentional effort to produce an identification they knew to be incorrect.

Moorer's related argument that the photo array isn't a reliable source of probable cause because he appeared to be the largest person also fails. *See* [163] at 37–38; *United States v. Traeger*, 289 F.3d 461, 474 (7th Cir. 2002) (citing *United States v. Moore*, 115 F.3d 1348, 1361 (7th Cir. 1997)) (police officers conducting lineups are required to make "reasonable efforts under the circumstances to conduct a fair and balanced presentation," not "search for identical twins in age, height, weight, or facial features"). It's debatable whether Moorer appears to be the largest person in the photo array. *See* [154-36]. His height and weight according to the array demographics was close to that of the fillers, *see id.*, but he actually weighed significantly more—235–245 pounds—at the time the photograph was taken. *See* [174] at 1.[31] If Moorer did appear larger than the other participants in the photo array, however, the difference between Moorer and the fillers was not so great as to create an overly suggestive lineup under due process standards. *See Traeger*, 289 F.3d at 474 (lineup wasn't suggestive where suspect was larger than other participants); *Funches*, 84 F.3d at 253 (lineup wasn't unduly suggestive where suspect was three-to-five inches shorter and twenty-to-forty-five pounds lighter than other lineup participants). And even at this stage of the case where inferences are drawn in Moorer's favor, the weight or size differential is not evidence from which a jury could

---

[31] Moorer hasn't offered any evidence that police officers were aware of Moorer's actual weight at the time the photograph was taken. *See* [174] ¶ 1.

conclude that the officers designed the lineup to trick the eyewitnesses into picking Moorer or that the officers knew he was not reasonably suspected of the crime. *See also* below at 32–38.

Moorer next argues that the photo array can't be relied on because the top three fillers appeared bald even though no witness described the offender that way. *See* [163] at 38. While the photograph of one of the men in the array is so light as to make identifying facial features impossible, the five other men in the array (including Moorer) have either short hair or none at all. *See* [154-36]; [154-37]. Given that only one of the witnesses had described the perpetrator's hairstyle, [174] ¶ 19, which didn't match Moorer's hair or that of any of the fillers, it wasn't suggestive to include bald men in the array because most of the witnesses hadn't identified any particular hair style for the suspect. *See United States v. Galati*, 230 F.3d 254, 260 (7th Cir. 2000) (finding that insubstantial differences in hair style did not make an array overly suggestive where the men pictured "all fit the general descriptions" offered by the witnesses); *United States v. Gonzalez*, 863 F.3d 576, 585 (7th Cir. 2017) (photo array was suggestive where only a suspect and one other man in the array matched the witness's description of a particular hairstyle).

That Moorer wore a dark shirt didn't make the in-person lineups an unreliable source for probable cause, either. *See* [163] at 37. In general, identifications aren't overly suggestive where a suspect wears an article of clothing associated with the description given by witnesses. *See, e.g., Coleman v. Alabama*, 399 U.S. 1, 6 (1970); *United States v. Williams*, 522 F.3d 809, 810–11 (7th Cir. 2008). Here, Moorer wasn't

the only person wearing a dark shirt in the initial in-person lineup, seen by five of the witnesses. *See* [154-38]. Only some of the witnesses described the attacker as having worn a black shirt, *see* [174] ¶¶ 3–4, 7, 13, 16, 19, 21, 23, and Moorer wore a shirt with lettering on it for the lineups, *see* [154-38]; [154-42], which isn't how any of the witnesses described the suspect. None of the witnesses who identified Moorer in the in-person lineups said they did so because of what he was wearing. [164] ¶¶ 60, 68.

Moorer also argues that the in-person lineups were unreliable because he was the only person who appeared in both the photo array and the in-person lineups (conducted within days of the photo array). *See* [163] at 37–38; [164] ¶¶ 68, 92–97. The problem for Moorer here is that, although suggestive, this is not a forbidden practice. So the photo array could still be considered when evaluating probable cause. *See United States v. Sanders*, 708 F.3d 976, 989 (7th Cir. 2013) (quoting *United States v. Griffin*, 493 F.3d 856, 865 (7th Cir. 2007)) ("[T]here is nothing per se impermissible about placing the same suspect in two different identification procedures."). Absent some evidence to suggest that Moorer's repeated appearance in different identification procedures was designed to have him selected or that the officers did not genuinely suspect him, the lineup identifications could support probable cause in his case.

On that front, Moorer does challenge the identifications on the basis of allegedly coercive or manipulative conduct by some of the CPD defendants. *See* [163] at 37–39. If a police officer coaches a witness by leading them to identify a particular

person, that identification cannot provide probable cause. *See Hart v. Mannina*, 798 F.3d 578, 588 (7th Cir. 2015); *Phillips v. Allen*, 668 F.3d 912, 917 (7th Cir. 2012). On this basis, Moorer challenges photo array identifications made by Edwin and Kindelan, and the in-person identification made by Miguel. *See* [163] at 38–39.

Before the identifications, each of the witnesses was presented with and signed an advisory form explaining that a suspect wouldn't necessarily be in the array or lineup and that the witness wasn't required to make an identification. *See* [164] ¶¶ 61–63, 87–88. And the witnesses weren't told who to identify or where Moorer was in the array or lineup. *Id*. ¶¶ 65, 91.

After Edwin initially identified Moorer's photograph from the results of the nickname search, detectives asked him if a separate photograph of Moorer was "the person that you picked," and then had Edwin sign that printout. *See* [174] ¶ 32. It's reasonable to infer, as plaintiff suggests, that the second printout of Moorer's photograph was, in fact, the photo array. *See id*.; [164] ¶¶ 56, 67; [154-37] at 4. CPD officers appear to have used the photo array to confirm Edwin's initial identification, which he made minutes before from among the results of the nickname search.[32] Asking Edwin to confirm his identification wasn't a separate, coercive identification,

---

[32] While that initial identification from among database results may not have followed best practices, police officers didn't use an already forbidden identification technique by showing Edwin the results of the nickname search. *See Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 348 (7th Cir. 2019) (citation omitted) (an officer's "cold search" on a database that led to photographs of a plaintiff along with more than 100 other possible suspects "may not have followed best practices" but wasn't suggestive under the Due Process Clause); *United States v. Jones*, 454 F.3d 642, 649 (7th Cir. 2006) (citation omitted) ("For the most part ... suggestive procedures involve the repeated presentation of only one suspect by the police to a witness, or a lineup in which the suspect is clearly distinguishable.").

and no one told Edwin who to identify among the many initial photographs that he was given. *See* [164] ¶ 56; [174] ¶ 31; *Phillips*, 668 F.3d at 917 (indicating that presenting a witness just one photograph and asking him to identify the culprit is impermissible).[33] Even if Edwin's viewing of the photo array as instructed by detectives was a separate, coerced identification, the use of the forbidden technique of telling Edwin who to identify doesn't taint all the other identifications in the case; it just means that police officers weren't entitled to rely on Edwin's photo array identification to establish probable cause. Edwin still identified Moorer from the larger group of photos, before he was prompted to confirm the identification, and other eyewitnesses identified Moorer independently of Edwin. *See Hart*, 798 F.3d at 590 (finding that circumstantial evidence concerning one coerced identification would need to be "compelling" in order to permit a reasonable inference that other identifications were also coached or manipulated).

Defendants didn't coerce Kindelan's photo array identification by documenting her choice, either. After Kindelan identified Moorer, detective Leal circled Moorer's photograph on Kindelan's copy of the array in order to verify her identification. [164] ¶ 66. The officers didn't coach or manipulate Kindelan because Leal documented an identification that the witness had already made; he didn't tell Kindelan who to pick out. *See id.*

---

[33] A proper documentation for that initial identification, as Moorer argues, would have required defendants to also preserve the database results that Edwin viewed. *See* [163] at 41.

Miguel said that detectives, calling him into the station to view the in-person lineup, told him that a suspect had been arrested and that it was the person he had identified in the photo array. *See* [164] ¶ 88. Conducting the lineup after priming the witness in this way was suggestive, because telling Miguel that the person he had previously identified had been arrested was likely to push the witness into identifying that person in a subsequent lineup. *See United States v. Jones*, 454 F.3d 642, 649 (7th Cir. 2006) (citing *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1045 (7th Cir. 2003); *United States v. Traeger*, 289 F.3d 461, 473–74 (7th Cir. 2002)) (suggestive procedures are those "that have been orchestrated to yield the identification of one particular suspect"). The suggestiveness of Miguel's in-person lineup identification meant that it couldn't contribute to probable cause; but Miguel's earlier photo array identification could. *See* [164] ¶ 68. And there's no basis from which to infer that the other identifications in this case were similarly tainted. *See Hart*, 798 F.3d at 590. In other words, that Miguel's in-person identification was suggestive isn't a basis for liability under the Fourth Amendment, which depends on the existence of probable cause. *See Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 919 (2017); *Phillips*, 668 F.3d at 917.

The techniques and procedures officers used during the array and lineups fell below the standards prescribed by police best practices. Department of Justice guidelines suggest moving a suspect's position in each lineup, *see* U.S. Department of Justice, Technical Working Group for Eyewitness Evidence, *Eyewitness Evidence: A Guide for Law Enforcement* 30 (October 1999), but the CPD defendants placed Moorer in the same position in the photo array given to all of the witnesses and in all but one

of the in-person lineups. [174] ¶ 88. It is reasonable to infer that the officers involved in the investigation also participated in the identifications, so they did not use a "double-blind" method wherein "the administering officer does not know who is and is not a suspect." *Hart v. Mannina*, 798 F.3d 578, 588 n.1 (7th Cir. 2015) (citations omitted).[34] Police officers conducting lineups should "[a]void saying anything to the witness that may influence the witness' selection," U.S. Department of Justice, Technical Working Group for Eyewitness Evidence, *Eyewitness Evidence: A Guide for Law Enforcement* 33–35 (October 1999), but that didn't always happen in this case.[35] However, procedural flaws like these do not necessarily establish police coercion or manipulation. *See Hart*, 798 F.3d at 588 ("[C]riticism of police methods does not by itself establish a constitutional violation."); *Askew v. City of Chicago*, 440 F.3d 894, 896 (7th Cir. 2006).[36]

---

[34] Plaintiff also argues that the lineups were defective because officers didn't record how confident the witnesses were in their identifications, *see* [163] at 16, 31, but doesn't cite any evidence showing that defendants failed in this way. *See* [174] ¶ 98. Moorer claims that the independence of the identifications was tainted because some of the witnesses sat together at the police station before viewing the in-person lineup. *See* [163] at 30–31; [174] 89. But the witnesses viewed the lineup independently of one another and waited in separate rooms until all of the other witnesses had finished. [164] ¶¶ 89–90.

[35] Before viewing the photo array, Hernandez said that police officers told her to "pick out who I seen." [164] ¶ 64. And during Edwin's viewing of the in-person lineup, he indicated that a second person involved in the shooting might be in the lineup, but officers told him to focus only on the man he knew as Boom. *Id.* ¶ 94. Neither of these instructions made the subsequent identifications unreliable as a source of probable cause because officers didn't tell the witnesses which individual to choose. *See Phillips v. Allen*, 668 F.3d 912, 917 (7th Cir. 2012).

[36] Plaintiff's citations to *Sanders v. City of Chicago Heights*, Case No. 13 C 0221, 2016 WL 2866097 (N.D. Ill. May 17, 2016) aren't helpful because that case, centering on the Due Process Clause, didn't involve a Fourth Amendment claim or identify a specific forbidden identification technique. *Kuri v. Folino*, 409 F.Supp.3d 626 (N.D. Ill. 2019) is distinguishable because that decision involved post-trial motions under Rules 50, 59, and 60, not Rule 56. In

Moorer hasn't pointed to any constitutionally forbidden technique that defendants used in order to coerce or manipulate every eyewitness into identifying him, and the bulk of the identifications were not so tainted, suggestive, or unreliable that they couldn't support the probable cause defendants needed to detain Moorer. *See Phillips v. Allen*, 668 F.3d 912, 915 (7th Cir. 2012); *Hart*, 798 F.3d at 587.

3.    *Other Procedural Problems, Missing Evidence, and Exculpatory Evidence*

Although imperfect or even shoddy as an evidence-gathering technique, the identification procedures used here did not require the officers to eliminate Edwin's initial identification or Martinez's lineup pick of Moorer from the probable cause assessment; and at a minimum, separately and as corroboration of each other, those two identifications established probable cause to believe Moorer committed a crime. But if defendants nonetheless knew or should have known that Moorer wasn't guilty, the officers couldn't rely on otherwise valid identifications. *See Hart v. Mannina*, 798 F.3d 578, 591 (7th Cir. 2015) (citations omitted) ("A police officer is permitted to rely on information provided by an eyewitness as long as the officer reasonably believes the witness is telling the truth."); *Reynolds v. Jamison*, 488 F.3d 756, 765 (7th Cir. 2007) (citations omitted) (an officer can rely on the complaint of a single witness to establish probable cause "unless the officer has a reason to question the witness' account"). Citing gaps in the record as to how he became a suspect, the loss of the

---

that case, evidence suggested that officers manipulated or fabricated identifications, and without the identifications, the court found that a jury's verdict that defendant officers lacked probable cause was not against the manifest weight of the evidence. *Id.* at 647.

victim's cell phone, exculpatory evidence, and failure to follow leads, Moorer claims
that's what happened here: defendants knew or should have known that he was
innocent and so they had reason to doubt the identifications. *See* [163] at 41–45.[37]

Moorer is right that it's not entirely clear how he became a suspect. Edwin
played the central role in first identifying Moorer,[38] but it's unclear which CPD officer
ran the nickname search, how many results that search turned up, or why Moorer's
photograph in particular was included in the images shown to Edwin. *See* [164] ¶ 55;
[174] ¶¶ 24–26, 28. Police officers failed to save the nickname search that turned up
Moorer's image, and also failed to preserve records of the initial photo array that
Edwin viewed. *See* [174] ¶¶ 28, 36. The timeline of events leading up to the photo
array identifications doesn't make sense, either. Edwin's interview with detective
Valkner (where it appears that he viewed the results of the nickname search for
twenty to thirty minutes and then identified Moorer) is timestamped 1:30 a.m., and
it generally took officers ten to twenty minutes to put together a photo array. *See*
[174] ¶¶ 7, 30; [164] ¶¶ 53–55. But at 1:35 a.m., just five minutes later, Hernandez
identified Moorer in a photo array. [164] ¶ 67.

---

[37] Moorer also argues that detective McDermott's racial bias undermines his credibility, but
as noted above, none of the undisputed facts depend on McDermott's credibility and the
objective evaluation of probable cause does not depend on the subjective reasons that
McDermott (or any defendant) actually detained Moorer. *See Young v. City of Chicago*, 987
F.3d 641, 644 (7th Cir. 2021) (citations omitted).

[38] Edwin told detectives that the man who entered his apartment was named Boom and that
Edwin had seen him before. [164] ¶ 53; [174] ¶¶ 7–8, 24. The name Boom led to a nickname
search in a police database. [174] ¶ 24; [164] ¶¶ 55–56; [165-15] at 10–11. Detectives gave
Edwin papers that included a picture of Thomas Moorer, along with photographs of other
people. *See* [164] ¶ 56; [174] ¶ 31. After looking at the photographs for twenty to thirty
minutes, Edwin identified Moorer as the assailant. [164] ¶ 56.

From these holes and discrepancies in the record, Moorer implies that a jury could fill the gaps with an inference that defendants set him up. But flawed policework is not a sufficient basis from which to draw that inference. *See Askew v. City of Chicago*, 440 F.3d 894, 896 (7th Cir. 2006) (police failure to follow correct procedures is a normal occurrence not "sufficient to permit second-guessing and damages"); *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 348 (7th Cir. 2019) (describing a similar "cold search" for suspects in a database as police not following best practices). The initial array that Edwin viewed appears rushed, it was poorly documented, and police records don't explain the precise order of operations that night, but it's not reasonable to infer from those procedural flaws that detectives knew Moorer was innocent. *See Askew*, 440 F.3d at 896; *Hart*, 798 F.3d at 588 (finding no Fourth Amendment liability where police officers failed to follow correct procedures but there was no evidence that procedural flaws led to a constitutional violation). There's no evidence that the detectives were aware of Moorer until after Edwin identified him, and they didn't just hand Moorer's photograph to Edwin: they asked him to look through a series of mugshots, with Moorer's being one among many. *See* [164] ¶ 56. No jury could infer from that process that defendants knew Moorer wasn't the murderer.

Officers mishandled evidence, too. But the fact that defendants lost or destroyed Edward's cellphone doesn't show that they knew Moorer was innocent.[39]

---

[39] Plaintiff also claims that one of the reports documenting a witness statement is "missing." *See* [102] ¶ 23. Moorer is probably referring to Kindelan's interview with detective Leal, which wasn't recorded. *See* [174] ¶ 21; [164] ¶¶ 51–52. Moorer hasn't alleged anything to

Because the phone number associated with Boom continued to be used after Moorer was arrested, *see* [174] ¶ 12, it's reasonable to infer that Edward's missing phone contained evidence that could have supported Moorer's case (e.g., other evidence that could identify Boom as someone other than Moorer). But McDermott needed to preserve evidence that he *knew* was exculpatory, and he had a duty to not destroy exculpatory evidence in bad faith. *See Hart*, 798 F.3d at 589 (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1998)). Plaintiff does not point to any evidence that McDermott knew the phone contained information that would exculpate Moorer,[40] or that McDermott destroyed it in bad faith, and the loss of the phone doesn't show that defendants knew Moorer was innocent. *See Hart*, 798 F.3d at 589 (rejecting an argument that the spoliation of evidence by police officers was a basis for liability under the Fourth Amendment where officers didn't destroy evidence recklessly or in bad faith).

Finally, Moorer argues that defendants had reason to doubt the identifications because evidence pointed away from him and defendants failed to adequately follow leads that would have shown he didn't commit the crime. *See* [163] at 42–44. The

indicate that the contents of that interview (which was documented in a separate scene report) should have shown officers that he was innocent, or suggested that it was destroyed in bad faith. *See* [163] at 9, 11–12.

[40] Plaintiff argues that the phone had known exculpatory value because (1) the phone referred to Boom, not Moorer's true nickname, Boomer; (2) the location of the phone associated with Boom didn't match up with Moorer's activities; and (3) because Edwin said that Boom had called or texted his brother prior to the murder. [163] at 50. It's reasonable to infer that McDermott knew the phone contained this evidence, but Plaintiff hasn't shown that this evidence was lost or concealed. It is not reasonable to infer that the phone had other undisclosed exculpatory evidence. And what was known about the phone was not so compelling that a jury could infer that McDermott did not genuinely believe the eyewitness after eyewitness who identified Moorer.

evidence that pointed away from Moorer at the time he was charged included: (1) Moorer's nickname was Boomer, not Boom, as indicated by a tattoo on Moorer's arm, [174] ¶ 48; (2) he didn't weigh as much at the time of his arrest as the man some of the witnesses had described, *see id.* ¶ 1; (3) detectives didn't find injuries on Moorer or blood on his clothing, *see id.* ¶ 52; (4) the phone number associated with Boom was known to be pinging at locations different from where Moorer lived or where his car was, *see id.* ¶¶ 46; and (5) Moorer's car didn't match the description of the offenders' vehicle. *Id.* ¶ 54.[41] Considering all of the facts and circumstances the officers were aware of, there was evidence that Moorer didn't commit the murder. But that evidence did not undermine defendants' probable cause to detain Moorer, which was based on identifications by seven different eyewitnesses. *See Coleman*, 925 F.3d at 351 (citation omitted) ("Where a reasonable person would have a sound reason to believe the suspect committed a crime, the police may arrest and allow the criminal justice system to determine guilt or innocence."); *Bridewell v. Eberle*, 730 F.3d 672, 676 (7th Cir. 2013) (citations omitted) (police officers determining whether probable cause exists aren't required to draw inferences in favor of a suspect); *Askew*, 440 F.3d at 896 (the Constitution "permits [police officers] to initiate the criminal process and leave the sifting of competing claims and inferences" to the judicial system).

---

[41] Moorer also argues that DNA evidence proved his innocence, *see* [163] at 18–20, 43–44, but that evidence was tested well after Moorer had been charged by the state's attorney, *see* [174] ¶ 65; [164] ¶¶ 121–22, and so the DNA analysis couldn't have undermined defendants' probable cause at the time Moorer was detained.

Moorer argues that defendants didn't thoroughly investigate his case. *See* [163] at 42–43. He claims defendants should have conducted a gun-shot residue test, searched his home and car, investigated a second shooter, and interviewed alibi witnesses,[42] but the officers weren't required to do any of those things. *See BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) (officers are required to pursue "reasonable avenues of investigation" and cannot ignore "facts that would help clarify the situation," but they are permitted to end their investigation once probable cause has been established).[43] Once the eyewitnesses in this case identified Moorer, defendants were entitled to rely on those identifications and were free to end their investigation. *See Williamson v. Curran*, 714 F.3d 432, 441 (7th Cir. 2013) (citations omitted) ("So long as an officer reasonably believes the putative victim of or eyewitness to a crime is telling the truth, he may rely on [that witness's statements] in deciding to make an arrest, without having to conduct an independent investigation into their accounts."); *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 624 (7th Cir. 2010) (citation omitted) ("While an officer may not close his or her eyes to clearly exculpatory facts,

---

[42] Plaintiff also argues that police officers manipulated reports to better fit Moorer's description, rather than the suspect's description as given by witnesses, *see* [163] at 8–9, 13, but no evidence supports that allegation. *See* [165-4] at 3; [165-6] at 3; [165-39] at 2.

[43] An officer "may not ignore conclusively established evidence of the existence of an affirmative defense," but the Fourth Amendment doesn't require police officers to investigate the validity of a defense. *Dollard v. Whisenand*, 946 F.3d 342, 355 (7th Cir. 2019) (quoting *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009)). There was no conclusive evidence that Moorer wasn't at the scene of the shooting: officers weren't required to take Moorer's word for it, and they had no duty to talk to every person in Moorer's house in order to verify his whereabouts. Unlike *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986), where officers had to continue to investigate because they lacked information on an essential element of a crime, defendants in this case had established probable cause on every element of the crime. *See id.* (citing *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 437–442 (7th Cir. 1986)).

the Fourth Amendment does not require an officer with probable cause to arrest to wait while pursuing further investigation.").

Defendants needed only a single eyewitness identification to supply probable cause. *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 346 (7th Cir. 2019) (citing *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015)). They had seven. *See* [164] ¶¶ 56, 68, 92–97, 106. Moorer has marshaled evidence to suggest that his detention was the product of subpar policework, but a jury could not conclude that defendants had reason to doubt the identifications, or to know that Moorer wasn't the murderer. The bulk of the identifications were a reliable source of probable cause, and defendants didn't know that Moorer was innocent. Defendants had probable cause to detain Moorer for murder.

### 4. *Proximate Cause*

Even if defendants lacked probable cause to detain Moorer, his Fourth Amendment claim would still face another challenge. To hold defendants liable under § 1983, Moorer needs to prove that defendants were the ones who caused a violation of his rights. *See Hoffman v. Knoebel*, 894 F.3d 836, 841 (7th Cir. 2018). He can't, and so his § 1983 claim fails for a lack of causation as well.

Section 1983 creates a form of tort liability for the deprivation of constitutional rights, privileges, or immunities. *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 916 (2017) (citing *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976)). But liability under § 1983 depends on a showing that the defendant's act was both "the cause-in-fact of the injury and its proximate cause." *Hoffman*, 894 F.3d at 841 (citing *Whitlock v.*

A38

*Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012)). An indictment generally breaks the chain of causation between an unlawful arrest and § 1983 tort liability. *See Colbert v. City of Chicago*, 851 F.3d 649, 655 (7th Cir. 2017) (quoting *Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996)) ("[T]he State's Attorney, not the police, prosecutes a criminal action ... [T]he chain of causation [between a wrongful arrest and post-indictment tort liability] is broken by an indictment, absent an allegation of pressure or influence exerted by the police officers, or knowing misstatements by the officers to the prosecutor."). To succeed on a § 1983 claim for unlawful pretrial detention against an arresting officer, Moorer must show "some postarrest action which influenced the prosecutor's decision to indict." *Id.* (quoting *Snodderly v. R.U.F.F. Drug Enf't Task Force*, 239 F.3d 892, 902 (7th Cir. 2001)); *see Young v. City of Chicago*, 987 F.3d 641, 645 (7th Cir. 2021) (allegations of police misconduct can undermine probable cause and support Fourth Amendment liability for unlawful pretrial detention); *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 351 (7th Cir. 2019) (citations omitted) (finding that the presumption of probable cause resulting from an indictment can be rebutted by "evidence that law enforcement obtained the indictment through improper or fraudulent means").

Moorer argues that defendants failed to tell the prosecuting attorney all of the relevant facts after the arrest, and that defendants revealed the timeline of the interviews and certain witness statements in supplemental reports only after charges had been brought. *See* [163] at 46–47. But the reports submitted after charges had been brought don't reveal anything about what the attorneys knew at the time of the

indictment. *See* [165-3]; [165-4]. And there's no evidence that the state's attorneys weren't aware of the procedures during the identifications, the timeline of identifications, the missing cellphone, the continued use of the phone number after Moorer was arrested, Moorer's lack of injuries, or the inconsistencies between Moorer's appearance and the descriptions given by the witnesses. *See* [164] ¶ 115.

The undisputed facts show that after the photo array identifications, the state's attorney came to the police station where she was updated on the investigation, reviewed police reports, and reinterviewed witnesses. *Id.* ¶ 73. After the in-person identifications, the state's attorney interviewed the six eyewitnesses who identified Moorer and two of Moorer's alibi witnesses, Vaneglen and Nobles. *Id.* ¶¶ 99, 111. Detectives Cardo, Gonzalez, and McDermott all testified that they never pressured the state's attorney or otherwise coerced her into approving the charges against Moorer. *Id.* ¶ 115.

There were flaws in the investigation, but it's not reasonable to infer from those flaws that the state's attorneys didn't know about aspects of the investigation or that a reasonable attorney in their position would have dropped the charges had they been aware. *See Armstrong v. Daily*, 786 F.3d 529, 553 (7th Cir. 2015) (discussing § 1983's causation requirement for a Due Process claim based on the destruction of exculpatory evidence). The state's attorneys knew about the progress of the investigation, interviewed the identifying and alibi witnesses, and weren't pressured or promised anything by police officers in exchange for indicting Moorer. *See* [164]

¶¶ 73, 99, 111, 115. Moorer hasn't offered any evidence that defendants influenced the attorneys' decision to indict. *See* [163] at 46–47.

Defendants had probable cause to detain Moorer before his trial. Alternatively, the grand jury's indictment severed the causal link between defendants' actions and Moorer's alleged injury.[44] Summary judgment is granted to defendants on the Fourth Amendment claim.

### B.    False Imprisonment

That defendants had probable cause to detain Moorer also defeats his state-law claim for false imprisonment. *See Poris v. Lake Holiday Prop. Owners Ass'n*, 368 Ill.Dec. 189, 203 (2013) (citing *Martel Enters. v. City of Chicago*, 223 Ill.App.3d 1028, 1034 (1st Dist. 1991)) ("Probable cause is an absolute bar to a claim for false imprisonment.").[45]

The false imprisonment claim also fails because it is time-barred. Illinois law requires that actions against "a local entity or any of its employees for any injury" be brought "within one year from the date that the injury was received or the cause of action accrued." 745 ILCS 10/8-101. A false imprisonment claim accrues when a

---

[44] Because the case can be decided on these grounds, I do not address the individual defendants' argument that they are entitled to qualified immunity on Moorer's Fourth Amendment claim. *See* [155] at 22.

[45] Having resolved the only federal claim, a district court ought to relinquish jurisdiction over supplemental state-law claims. *Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015); *see* 28 U.S.C. § 1367(c). But the balance of judicial economy, convenience, fairness, and comity weighs in favor of a merits decision on state-law false imprisonment claim. *See Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). The finding of probable cause for the detention makes it clear how Moorer's false imprisonment claim must be decided, and the statute of limitations has also run.

plaintiff is held pursuant to a warrant or other judicial process. *See Nat'l Cas. Co. v. McFatridge*, 604 F.3d 335, 344 (7th Cir. 2010) (citing *Mercado v. Vill. of Addison*, 385 Ill.App.3d 1006 (2d Dist. 2008); *Smith v. Boudreau*, 366 Ill.App.3d 958 (1st Dist. 2006)); *Kitchen v. Burge*, 781 F.Supp.2d 721, 738 (N.D. Ill. 2011). Here, Moorer was indicted by the grand jury in September 2010, *see* [164] ¶¶ 116–120, and so he had until September 2011 to file his state-law false imprisonment claim. But his original complaint was filed on May 30, 2018, [1], which makes this claim untimely.[46]

Summary judgment is granted to defendants on the false imprisonment claim.

## C.    Spoliation of Evidence

Negligent spoliation of evidence is a type of negligence, not an independent tort. *See Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 509–510 (7th Cir. 2007); *Boyd v. Travelers Ins. Co.*, 166 Ill.2d 188, 192–193 (1995).[47] To show negligent spoliation, a plaintiff must prove that a defendant owed him a duty to preserve the evidence in question; a breach of that duty; an injury proximately caused by the breach; and actual damages. *See Borsellino*, 477 F.3d at 510; *Boyd*, 166 Ill.2d at 194–

---

[46] Moorer failed to make any arguments as to why his state-law false imprisonment claim wasn't barred by the statute of limitations. *See* [163]. He has forfeited any arguments in opposition to the statute of limitations defense. *See Salas v. Wisconsin Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007) (citing *Witte v. Wisconsin Dep't of Corr.*, 434 F.3d 1031, 1038 (7th Cir. 2006)) (a nonmovant forfeits arguments it fails to raise in a brief opposing summary judgment).

[47] Considering the factors of 28 U.S.C. § 1367(c), it makes sense to retain jurisdiction over this state-law claim as well. The district court and the parties have already expended substantial judicial resources: litigation began more than three years ago, and the parties have completed discovery. *See Hansen v. Bd. of Trustees of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 608 (7th Cir. 2008). This claim is based on McDermott's conduct during the investigation and is intertwined with the federal claim. The correct disposition is clear, and it serves judicial economy to decide the spoliation claim now.

195. Here, Moorer alleges that detective McDermott negligently destroyed evidence when he failed to preserve Edward Ramos's cellphone and a general progress report. *See* [102] ¶¶ 58–63; [163] at 49–51.[48]

There is no general duty to preserve evidence under Illinois law, but one may arise if the parties are sufficiently related and it was foreseeable that the evidence would be used in future litigation. *See Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 609 (7th Cir. 2016). Moorer argues that McDermott owed him a duty to preserve evidence because proper police practices required detectives to document and inventory evidence, [163] at 49, but standard police practices aren't enough to show a duty under Illinois law. *See Schaefer*, 839 F.3d at 609; *Boyd*, 166 Ill.2d at 195. Moorer's lawyers never asked McDermott to preserve the evidence and McDermott didn't segregate the evidence for Moorer's benefit. *See Boyd*, 166 Ill.2d at 195; *Martin v. Keeley & Sons, Inc.*, 365 Ill.Dec. 656, 665 (2012). McDermott never voluntarily undertook a duty to preserve the evidence for Moorer, either. *See Martin*,

---

[48] Moorer also brought his spoliation claim against "other unknown defendants." [102] at 10. Moorer failed to identify those defendants during discovery, however, and so the unknown defendants are dismissed from the case. *See Williams v. Rodriguez*, 509 F.3d 392, 402 (7th Cir. 2007); Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party."). Defendants argue that Moorer's spoliation claim is time-barred. [155] at 44–45. Under Illinois law, Moorer had one year from the date that his cause of action accrued to file suit. *See* 745 ILCS 10/8-101(a). For most torts, the cause of action accrues when the plaintiff suffers injury, but the discovery rule delays commencement of the relevant statute of limitations until the plaintiff knows or reasonably should know that he has been injured and that his injury was wrongfully caused. *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill.2d 72, 77–78 (1995) (quoting *Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, 158 Ill.2d 240, 249 (1994)). When Moorer should have discovered the missing evidence in this case is generally a question of fact, *see Jackson*, 158 Ill.2d at 250 (citation omitted), and it's not clear that he should have learned about the missing phone during his criminal trial. Moorer's spoliation claim isn't clearly time-barred, and so summary judgment on the basis of the statute of limitations isn't appropriate.

365 Ill.Dec. at 662 (finding that a showing of voluntary undertaking requires that a plaintiff demonstrate "affirmative conduct by [defendant] showing [his] intent to voluntarily undertake a duty" to the plaintiff). The law—the Due Process Clause of the Fourteenth Amendment—does impose a duty on police officers to preserve some evidence, but officers breach that duty only in a narrow set of circumstances. *See United States v. Cherry*, 920 F.3d 1126, 1140 (7th Cir. 2019) (quoting *United States v. Fletcher*, 634 F.3d 395, 407 (7th Cir. 2011)).

Assuming that the Due Process Clause can support a duty to preserve evidence under Illinois law, Moorer's claim fails because he hasn't shown a breach. Moorer agrees that the standard of care applicable to McDermott is that for an Illinois police officer solely engaged in law enforcement, *see* [163] at 49, and McDermott is liable only if he lost or destroyed the evidence in a willful and wanton way. 745 ILCS 10/2-202; *Fitzpatrick v. City of Chicago*, 112 Ill.2d 211, 214 (1986). Willful and wanton conduct "means a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210; *see McDowell v. Vill. of Lansing*, 763 F.3d 762, 768 (7th Cir. 2014) (quoting *Geimer v. Chicago Park Dist.*, 272 Ill.App.3d 629 (1st Dist. 1995)) ([willful] and wanton conduct "means more than mere inadvertence, incompetence, or unskillfulness").

It's not clear which general progress report Moorer alleges that McDermott lost, *see* [102] ¶¶ 23, 59, but it seems likely Moorer means the report from an initial interview with Kindelan. *See* [163] at 11. Moorer doesn't allege any connection

between McDermott's conduct and the absence of that report, and the parties agree that Leal never made a report summarizing that interview. *See* [164] ¶ 52. Because there was no report to preserve and McDermott wasn't involved in the interview, McDermott didn't breach any duty to Moorer involving that general progress report.

As for the cellphone, McDermott requested that the forensic investigator turn over Edward Ramos's phone to him, rather than inventory it, and the investigator gave McDermott the phone. [164] ¶ 47; [174] ¶ 66. After that, the cellphone disappears from the record. [174] ¶ 67; [164] ¶ 71. McDermott said that he or someone else should have documented and inventoried it, [174] ¶ 67, but there's no evidence that McDermott intentionally lost or destroyed the evidence or acted with conscious disregard for Moorer's safety. While it's reasonable to infer that Edward's missing phone contained evidence that could have supported Moorer's case, that doesn't mean that McDermott destroyed the phone in a willful or wanton way. At most, the undisputed facts show that McDermott was inadvertent or incompetent in his handling of the evidence, and that's not enough to show negligent spoliation under Illinois law. *See* 745 ILCS 10/1-210; *McDowell*, 763 F.3d at 768.

Summary judgment is granted to defendant McDermott on the spoliation claim.

## IV.    Conclusion

Thomas Moorer spent years in pretrial detention based on eyewitness identifications that were of questionable reliability. He was acquitted at trial. Moorer understandably seeks recompense for his pretrial detention, but because probable

A45

cause is a low bar, the Fourth Amendment did not prohibit the officers from relying on the identifications and letting the lawyers, judge, and jurors resolve Moorer's guilt. Without any evidence to suggest that defendants knew the identifications were wrong or that the officers were the legal cause for detention after the prosecutor, grand jury, and court weighed in, a civil lawsuit under the Fourth Amendment simply does not lie.

Defendants' motion for summary judgment, [153], is granted. Enter judgment and terminate civil case.


ENTER:

Manish S. Shah
United States District Judge

Date:   December 20, 2021

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**

Thomas Moorer,

Plaintiff,

v.

J. Valkner, et al.,

Defendants.

Case No.  18-cv-03796
Judge Manish Shah

## **JUDGMENT IN A CIVIL CASE**

Judgment is hereby entered (check appropriate box):

☐ in favor of plaintiff(s)
and against defendant(s)
in the amount of $          ,

which ☐ includes        pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

_____

☒ in favor of defendants City of Chicago, J. Valkner, J. Gonzalez,  J. Cardo, T. McDermott,
J. Folino,  M. Benigno, F. Szwedo, E. Leal, N. Spanos, B. Tedeschi,  S. Becker,
and against plaintiff Thomas Moorer. Defendants shall recover costs from plaintiffs.

_____

☐ other:

_____

This action was *(check one)*:

☐ tried by a jury with Judge Manish Shah presiding, and the jury has rendered a verdict.
☐ tried by Judge Manish Shah without a jury and the above decision was reached.
☒ decided by Judge Manish Shah on a motion.

Date:  12/20/2021

Thomas G. Bruton, Clerk of Court

/Susan McClintic , Deputy Clerk

A47